

**DeNittis | Osefchen | Prince**, P.C.
Attorneys at Law

denittislaw.com

5 Greentree Centre
525 Route 73 North, Suite 410
Marlton, NJ 08053
P: 856.797.9951 | F: 856.797.9978

1515 Market Street, Suite 1200
Philadelphia, PA 19102
P: 215.564.1721 | F: 215.564.1759

315 Madison Ave., 3rd Floor
New York, NY 10017
P: 646.979.3642

March 3, 2023

<u>Via ECF Only</u>
The Honorable Zahid N. Qurashi, U.S.D.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street Room 2020
Trenton, NJ 08608

> Re:   **Corsi, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.**
> **Civil Action No. 3:22-cv-4621-ZNQ-RLS**

Dear Judge Qurashi:

Plaintiffs submit the attached correspondence that was filed with the American Arbitration Association on March 2, 2023. This correspondence is being filed with the Court because it is relevant and related to Defendants' pending Motion to Compel Arbitration in this matter, and moreover directly addresses Defendants' letter of February 27, 2023. Plaintiffs respectfully request this correspondence to be added to the record for consideration.

Thank you for Your Honor's consideration in this matter.

Respectfully submitted,

DeNITTIS OSEFCHEN PRINCE, P.C.

STEPHEN P. DeNITTIS

SPD: jra
Encl.
cc:   All Counsel of Record (via eCourts and Email)



Stephen P. DeNittis***1 | Joseph A. Osefchen | Shane T. Prince* | Joseph A. D'Aversa | Charles J. Galvin* | Donald F. Browne, Jr.

*Member of the NJ & PA Bar    **Member of the NJ & NY Bar    1Certified Civil Trial Attorney by the Supreme Court of New Jersey



**HATTIS & LUKACS**
**Attorneys at Law**

**Washington Office**
11711 SE 8ᵗʰ Street, Ste 120
Bellevue, WA 98005
Phone: 425.233.8650
www.hattislaw.com

Daniel M. Hattis, Esq.
425.233.8628
dan@hattislaw.com

March 2, 2023

**BY EMAIL**

Ms. Jill Roettger
Manager of ADR Services
American Arbitration Association

      Re:    *Individuals v. Cellco Partnership d/b/a Verizon Wireless,*
              *and Verizon Communications, Inc.*
              Case No. 01-22-0003-9225

Dear Ms. Roettger:

      **Introduction.** In this set of Multiple Case Filings, the American Arbitration Association ("AAA") requested that Respondents Cellco Partnership d/b/a Verizon Wireless and Verizon Communications, Inc. (collectively, "Verizon") unilaterally waive—without the Individual Claimants' consent—the mass arbitration provision in its Customer Agreement, and Verizon agreed to the waiver.

      However, under the express terms of the Verizon Customer Agreement, the AAA did not have the authority to request the unilateral waiver, and Verizon did not have authority to grant the unilateral waiver. A waiver would constitute a change to the Customer Agreement's dispute resolution provision, but the Customer Agreement explicitly forbids any change to the dispute resolution provision in the course of an existing dispute: **"[I]f we make any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change."** Customer Agreement, p. 2 (last sentence on page) (**Exhibit A**, attached). The Individual Claimants **do not** agree to waive the provision and **do not** agree to this change.[1]

---

[1] The Individual Claimants have always preferred and desired their claims to be heard in court, rather than in arbitration. Currently, the verdict is not final in the courts regarding whether under the laws of the various states Verizon's arbitration clause is unenforceable. If all the courts agreed that under the laws of the various states consumers cannot be compelled to arbitration with Verizon, then at that point we would withdraw the arbitrations and proceed on a class basis in court. But in the meantime—*as long as the AAA does not decline to administer these arbitrations*—our clients cannot withdraw their arbitrations because, if the courts instead agree with Verizon and compel arbitration, then the Individual Claimants will have been prejudiced (e.g., by the running of the statutes of limitations).

March 2, 2023
Page 2

Moreover, as the arbitration agreement within the Verizon Customer Agreement constitutes a contract between Verizon and each Individual Claimant, Verizon cannot simply unilaterally "waive" a provision of that contract without each Individual Claimant's consent— particularly a provision that, based on the February 22, 2023 Order by Process Arbitrator Bruce E. Meyerson, now inures to the benefit of the Individual Claimants (the Individual Claimants have always preferred to be in court rather than in arbitration). Meanwhile, the AAA Rules **do not** provide for or allow the AAA to ask Verizon for a unilateral waiver *without the Individual Claimants' consent*. In fact, Rule R-1(d) specifies that if the contract does not comply with the Consumer Due Process Protocol, then "either party may choose to submit its dispute to the appropriate court for resolution."

Consequently, the purpose of this letter is to respectfully request that the AAA withdraw as ultra vires its request to Verizon to unilaterally waive the mass arbitration provision, as well as to withdraw all of the AAA's attendant documents, including its invoice of Initial Administrative Fees. Verizon's purported waiver should be treated as null ab initio. If the AAA declines to withdraw these documents, the Individual Claimants respectfully request the re-appointment of Process Arbitrator Bruce E. Meyerson to address this issue.

**Background.** On February 22, 2023, the Process Arbitrator in this Consumer Multiple Case Filing proceeding issued an Order ruling that Section 6 of Verizon's arbitration agreement—the mass arbitration provision—violated Principle 8 of the Due Process Protocol. As of that point in time, the AAA was forbidden by its own rules from continuing to administer any of the Individual Claimants' demands for arbitration. *See* AAA Consumer Arbitration Rules, Rule R-1(d).

At 3:02 p.m. Pacific Time on February 24, 2023, the AAA emailed a letter requesting that Verizon unilaterally waive the mass arbitration provision. "[S]o that the AAA may continue administration of these matters, we request that the business waive the language in Section 6 that violates Principle 8 of the Consumer Due Process Protocol." Letter from J. Roettger to D.M. Hattis & A.M. Mortimer, dated Feb. 24, 2023 (the "Waiver Request Letter"), p. 2.

At 3:28 p.m. PT the same day, Verizon, through counsel, agreed to AAA's request for a waiver. "Verizon elects to waive the requirements of paragraph (6) of the Verizon Customer Agreement dated October 20, 2021, which governs the claims filed to date by Mr. Hattis." Letter from A.M. Mortimer to V. Chandler, dated Feb. 24, 2023, at p. 1. Verizon, through counsel, also signed and returned, as requested by the AAA, the Waiver Request Letter.

On February 28, 2023, the AAA acknowledged receipt of Verizon's waiver. Letter from J. Roettger to D.M. Hattis & A.M. Mortimer, dated Feb. 28, 2023 ("the Acknowledgement Letter"), at p. 1. With the Acknowledgement Letter, the AAA enclosed an invoice directed to the Individual Claimants for the payment of initial administrative fees in the sum of $122,400 (the "Invoice").

**Verizon Is Prohibited By Its Own Customer Agreement From Waiving The Mass Arbitration Provision.** The AAA acted ultra vires in issuing the Waiver Request Letter, the Acknowledgement Letter and the Invoice. By this letter, the Individual Claimants respectfully

March 2, 2023
Page 3

request that the AAA withdraw the Waiver Request Letter, the Acknowledgement Letter and the Invoice. If the AAA declines to do so, the Individual Claimants request that Process Arbitrator Bruce E. Meyerson be re-appointed to adjudicate the issue, with the Waiver Request Letter, the Acknowledgement Letter and the Invoice being held in abeyance until the Process Arbitrator rules.

The Verizon Customer Agreement explicitly prohibits Verizon from granting a unilateral waiver of a dispute resolution provision and, as the document governing this set of Multiple Case Filings, prohibits AAA from requesting or accepting from Verizon a unilateral waiver of a dispute resolution provision *without the Individual Claimants' consent*.

The Customer Agreement reads in relevant part (in the last sentence on page 2): **"[I]f we make any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change."** (This provision will be referred to herein as the Lock-In Clause, because it locks in the set of rules to be used to resolve a dispute.)

The plain language of the Lock-In Clause prohibits Verizon from waiving the mass arbitration provision. All of the Individual Claimants' disputes with Verizon have "arose." *See* Merriam—Webster Dictionary ("arose" is past tense of "arise," which means "to begin to occur"). They arose, at the latest, on June 4, 2022, when the Individual Claimants emailed their demands for arbitration to the AAA as part of this Multiple Case Filing. *See* Email from D.M. Hattis to MultiCaseFiling@adr.org, sent on June 4, 2022, at 12:56 p.m. PT (which was copied to Verizon's counsel). And the Individual Claimants had previously served notice of their claims on Verizon on March 3, 2022, and March 29, 2022.

A waiver is a type of change. *See* Merriam-Webster Dictionary (first definition of noun "change" is "alteration"). *See also Lynch v. California Coastal Commission*, 3 Cal. 5th 470, 475 (2017) (a "waiver" is defined as "the intentional relinquishment or abandonment of a known right").

By waiving a contractual provision, a party is altering the terms of the contract. The waiving party is pointing to a provision in the contract that both sides agreed to and anticipated would be enforced; but, instead of allowing the provision to be enforced, the waiving party is altering the arrangement by declaring that the provision is now a dead letter and that any prior understanding of it being enforced must also be altered.[2]

A federal court has already enforced the Lock-In Clause and held that Verizon cannot make changes to its dispute resolution provision concerning an existing dispute. In *MacClelland v. Cellco Partnership*, --- F. Supp. 3d ---, 2022 WL 2390997, *13 (N.D. Cal. July 1, 2022) (app. pend.) (**Exhibit B**, attached), Verizon attempted to save the mass arbitration provision by informing the Court that Verizon would soon be changing the Customer Agreement to toll a claimant's limitations periods while the claimant waited for their 10-at-a-time batch of arbitrations to commence. And then, after oral argument, Verizon filed an additional Notice with

---

[2] In counsels' experience, very few arbitration agreements have a clause in the agreement, such as Verizon's, which **explicitly** prohibits any changes to the agreement once a dispute has arose.

March 2, 2023
Page 4

the Court stating that Verizon would be voluntarily waiving the statutes of limitations for the plaintiffs and their existing disputes until their arbitrations commenced. The plaintiffs then filed a response with the Court pointing out that Verizon's arbitration agreement—and specifically the Lock-In Clause—prohibited Verizon doing so.

> The Court then ruled:

> Plaintiffs are correct: the Agreement specifically provides that "if [Verizon] make[s] any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change." Agreement at 2. As a result, Verizon's efforts to cure the statute of limitations problem for the Plaintiffs herein are unavailing.

*Ibid.*

If the AAA were to allow Verizon to unilaterally waive the mass arbitration provision, the AAA would be placing itself in direct contravention to the plain language of the Lock-In Clause.

**Verizon Is Prohibited From Unilaterally Waiving Any Portion Of The Verizon Customer Agreement Without Each Individual Claimant's Consent.** Additionally, the arbitration agreement within the Verizon Customer Agreement constitutes a contract between Verizon and each Individual Claimant.[3] The presence of the mass arbitration provision in the Verizon Customer Agreement now inures to the benefit of the Individual Claimants because, based on the February 22, 2023 Order by Process Arbitrator Bruce E. Meyerson that the mass arbitration provision violated Principle 8 of the AAA Due Process Protocol, the AAA is now forbidden by its own rules from administering any of the Individual Claimants' demands for arbitration so long as the mass arbitration provision remains. Claimants may therefore file their claims in Court or be part of a class action concerning their claims—*which is their preference*. To be clear, the Individual Claimants **do not** agree to waive the mass arbitration provision and **do not** agree to this change in Verizon's dispute resolution provision.

Verizon cannot waive the mass arbitration provision of its contract with each Individual Claimant without, at minimum, the mutual assent of each Individual Claimant. Indeed, if parties were permitted to unilaterally waive portions of a contract that disadvantaged them, then the Individual Claimants could (and would) have waived the entire arbitration section of the Verizon Customer Agreement and filed their claims in court.

Moreover, the AAA Rules do not provide for or allow the AAA to ask Verizon for a unilateral waiver without the Individual Claimants' consent. Consumer Rule R-1(d) states that the AAA's acceptance of a case is contingent upon the determination that "the agreement substantially and materially complies with the due process standards." And if the agreement does not comply, the **only** procedure stated in Rule R-1(d) is that "either party may choose to submit

---

[3] Individual Claimants and their counsel have challenged select portions of this arbitration agreement, including the mass arbitration provision, as unconscionable and specifically reserve all rights regarding such challenges, whether before the AAA or in court.

March 2, 2023
Page 5

its dispute to the appropriate court for resolution." There is **<u>no</u>** mention of asking the business to unilaterally waive offending provisions—without the consent of the claimants—anywhere in the Rules.[4]

Meanwhile, the Due Process Protocol itself explicitly refers to the ability of a consumer to waive an offending provision but makes **<u>no</u>** mention of the business' ability to waive ***without the consumer's consent***. "Assuming they have sufficient specific knowledge and understanding of the rights they are waiving, however, Consumers may waive compliance with these Principles after a dispute has arisen." Due Process Protocol, p. 10.

**The Individual Claimants Request That The AAA Withdraw The Waiver Request Letter, The Acknowledgement Letter And The Invoice.** As discussed above, the Individual Claimants contend that the AAA's issuance of the Waiver Request Letter, the Acknowledgement Letter and the Invoice was predicated upon the legally erroneous assumption or conclusion that the AAA's asking Verizon for a unilateral waiver—*without the Individual Claimants' consent*— was consistent with the terms of the Customer Agreement, contract law, and the AAA Rules. Consequently, the Individual Claimants respectfully request that the AAA cure its ultra vires conduct by promptly withdrawing the Waiver Request Letter, the Acknowledgement Letter and the Invoice. This would allow the Individual Claimants to exercise their right under Consumer Rule R-1(d) to "choose to submit its dispute to the appropriate court for resolution."

**In The Alternative, The Individual Claimants Request That The AAA Re-Appoint Process Arbitrator Bruce E. Meyerson To Address This Issue.** The Individual Claimants have the right under the AAA's Supplementary Rules For Multiple Case Filings ("Supp. Rules") to request the re-appointment of Process Arbitrator Bruce E. Meyerson to resolve this issue, and the Individual Claimants hereby make said request in the event that the AAA declines to withdraw the Waiver Request Letter, the Acknowledgement Letter and the Invoice.

The AAA's issuance of the Waiver Request Letter, the Acknowledgement Letter and the Invoice were all initial administrative determinations made by the AAA. As discussed above, the Individual Claimants contend that the issuance of these documents was predicated upon the legally erroneous assumption or conclusion that the AAA's asking Verizon for a unilateral waiver—without the Individual Claimants' consent—was consistent with the terms of the Verizon Customer Agreement, contract law, and the AAA Rules.

The AAA's issuance of the Waiver Request Letter, the Acknowledgement Letter and the Invoice were all initial "administrative" determinations as per Supplementary Rule MC-6(a) and (d). The act of requesting a unilateral waiver to allow these Multiple Case Filings to proceed to arbitration is on its face an administrative determination, which arose "out of the nature of the Multiple Case Filings." Supp. Rule MC-6(d)(v). The act of issuing the Invoice to the Individual Claimants for 1,958 arbitrations is an "allocation of payment advances" and also an "administrative issue arising out of the nature of the Multiple Case Filings." Supp. Rule MC-

---

[4] This letter constitutes Individual Claimants' objection in writing, pursuant to Rule R-50, that the Rules have not been followed.

March 2, 2023
Page 6

6(d)(ii), (v). (If Verizon balks at the notion that these are "administrative" determinations, the Process Arbitrator has the authority to determine his own jurisdiction. Supp. Rule MC-6(f).)

By this letter, the Individual Claimants provide a "written notice of disagreement." Supp. Rule MC-6(b).

The AAA has the authority to re-appoint Mr. Meyerson. The AAA may re-appoint an arbitrator who has previously served as the Process Arbitrator if "new and different administrative issues" are to be determined. Supp. Rule MC-6(i). The issuance of the Waiver Request Letter, the Acknowledgement Letter and the Invoice are all "new and different" issues for the simple reason that the three documents were served *after* Mr. Meyerson issued his Order on Feb. 22, 2023 (**Exhibit C**, attached).

**More substantively, Mr. Meyerson's Order expressly carved out and declined to rule on the key question: Does the Lock-In Clause prohibit Verizon from waiving the mass arbitration provision for these already existing claimant disputes?** The Order acknowledged that, within the Customer Agreement, Verizon reserves the right to amend the agreement. Order, pp. 14:18-15:3. However, the Order expressly kept ***open and undecided*** the question of whether Verizon could lawfully exercise this power ***with regard to the claims of the Individual Claimants***. On this issue, the Order stated, "I express no opinion whether such a solution would apply to the present dispute." Order, p. 15:26.[5]

In the view of the Individual Claimants, the Lock-In Clause, blackletter contract law, and the AAA's own Rules prohibit Verizon from unilaterally exercising this power without the Individual Claimants' consent, and, if the AAA will not withdraw the three documents, then the Individual Claimants have the right to ask the Process Arbitrator to resolve the issue.

A final but important point: If the AAA declines to withdraw the Waiver Request Letter, the Acknowledgement Letter and the Invoice and opts instead to re-appoint the Process Arbitrator, then the Waiver Request Letter, the Acknowledgement Letter and the Invoice (and the payment and other deadlines therein) should all be held in abeyance until the Process Arbitrator rules. If the Individual Claimants are correct, these three documents should never have been issued in the first place—which means the Individual Claimants should not be prejudiced by having to comply with the payment and other deadlines therein only to later obtain a ruling that compliance was never necessary. The status quo is best maintained, and the equities most fairly balanced, by holding the three documents and their deadlines in abeyance until the Process Arbitrator rules.

Thank you for your time and consideration. I can be reached at (425) 233-8628 or dan@hattislaw.com.

---

[5] The Order also generically stated, "Nothing about this ruling is intended, however, to deprive the Association of its customary practice of asking a registrant to either waive the offending provision or revise it to bring the clause into compliance with the Protocol." Order, p. 15:12-15. Notably, the Order did **not** make a specific determination about the application of the Lock-In Clause to these Individual Claimants or whether Verizon could unilaterally waive a provision without the Individual Claimants' consent.

March 2, 2023
Page 7

Very truly yours,

Daniel M. Hattis

<u>Enclosures</u>

**Exhibit A**: Verizon Customer Agreement, dated Oct. 20, 2021

**Exhibit B**: *MacClelland v. Cellco Partnership*, --- F. Supp. 3d ---, 2022 WL 2390997, *13 (N.D. Cal. July 1, 2022)

**Exhibit C**: Order of Process Arbitrator, dated Feb. 22, 2023

cc:     Ann Marie Mortimer, Esq., Counsel for Respondents
        Stephen P. DeNittis, Esq., Co-Counsel for the Individual Claimants

EXHIBIT A

# My Verizon Wireless Customer Agreement

(Para una copia de este documento en español, visite nuestro website: verizon.com/espanol)

**Thanks for choosing Verizon. In this Customer Agreement ("Agreement"), you'll find important information about your wireless Service, including:**

• **Our ability to make changes to your Service or this Agreement's terms.**
• **Our liability if things don't work as planned and how any disputes between us must be resolved in arbitration or small claims court.**

### My Service
**Your Service terms and conditions are part of this Agreement.** Your Plan includes your monthly allowances and features, where you can use them (your "Coverage Area"), and their monthly and pay-per-use charges. You can also subscribe to several Optional Services, like international service plans or equipment protection services. Together, your Plan, features you use and any Optional Services you select are your Service. Your billing and shipping addresses, and your primary place of use, must be within the areas served by the network Verizon owns and operates. The current version of this Agreement and the terms and conditions for your Service are available online at verizon.com. A description of permitted and prohibited uses for calling and Data Services is available online at verizon.com/support/important-plan-information; prepaid customers should visit verizon.com/support/prepaid-customer-info-legal.

By using the Service, you are agreeing to every provision of this Agreement whether or not you have read it. This agreement also applies to all lines on your account and anyone who uses your Service.

### Cancellation
**You can cancel a line of Service within 30 days of accepting this Agreement without having to pay an early termination fee as long as you return, within the applicable return period, any equipment you purchased from us or one of our authorized retailers at a discount in connection with your acceptance of this Agreement, but you'll still have to pay for your Service through that date. If you signed up for Prepaid Service, no refunds will be granted after 30 days or if your account has been activated. See verizon.com/support/return-policy/ for complete details and information on returning your equipment.**

### My Privacy
Accepting this Agreement means that you also agree to our Privacy Policy, available at verizon.com/privacy, which may be updated from time to time and describes the information we collect, how we use and share it, and the choices you have about how certain information is used and shared. We will notify you or ask for your permission, as appropriate, if we plan to use your information for additional purposes. It is your responsibility to let the people who connect devices through your mobile hotspot, Jetpack or wireless router know that we will collect, use and share information about their device and use of the Service as described in our Privacy Policy.

If you subscribe to Service for which usage charges are billed at the end of the billing period ("Postpay Service"), or have a device payment installment agreement, we may investigate your credit history at any time in connection with the service subscription or device payment installment agreement. If you'd like the name and address of any credit agency that gives us a credit report about you, just ask.



© 2021 Verizon
CA-1021EN

Many services and applications offered through your device may be provided by third parties. You should review the applicable terms and privacy policy before you use, link to or download a service or application provided by a third party.

You agree that Verizon and collections agencies that work on our behalf may contact you about your account status, including past due or current charges, using prerecorded calls, email and calls or messages delivered by an automatic telephone dialing system to any wireless phone number, other contact number or email address you provide. Verizon will treat any email address you provide as your private email that is only accessible by you; you acknowledge that we may send you receipts, notices and other documents regarding your service to this email address. Unless you notify us that your wireless service is based in a different time zone, calls will be made to your cellular device during permitted calling hours based upon the time zone affiliated with the mobile telephone number you provide.

**What happens if my Postpay Service is canceled before the end of my contract term?**
If you're signing up for Postpay Service, you're agreeing to subscribe to a line of Service either on a month-to-month basis or for a minimum contract term, as shown on your receipt or order confirmation. (If your Service is suspended without billing or at a reduced billing rate, that time doesn't count toward completing your contract term.) Once you've completed your contract term, you'll automatically become a customer on a month-to-month basis for that line of Service. **If your line of service has a contract term and you cancel that line, or if we cancel it for good cause, during that contract term, you'll have to pay an early termination fee. If your contract term results from your purchase of an advanced device, your early termination fee will be $350, which will decline by $10 per month upon completion of months 7 – 17, $20 per month upon completion of months 18 – 22, $60 upon completion of month 23 and will be $0 upon completion of the contract term. For other contract terms, your early termination fee will be $175, which will decline by $5 per month upon completion of months 7 – 17, $10 per month upon completion of months 18 – 22, $30 upon completion of month 23 and will be $0 upon completion of your contract term. Cancellations will become effective on the last day of that month's billing cycle,** and you are responsible for all charges incurred until then. Also, if you bought your wireless device from an authorized agent or third-party vendor, you should check whether it charges a separate termination fee.

**If you purchased a device on a monthly installment agreement and cancel service, you should check that agreement to determine if you may have to immediately pay off the balance.**

**Your Mobile Number and Porting**
You may be able to transfer, or "port," your wireless phone number to another carrier. If you port a number from us, we'll treat it as though you asked us to cancel your Service for that number. After the porting is completed, you won't be able to use our service for that number, but you'll remain responsible for all fees and charges through the end of that billing cycle, just like any other cancellation. If you're a Prepaid customer, you won't be entitled to a refund of any balance on your account. If you port a number to us, please be aware that we may not be able to provide some services right away, such as 911 location services. You don't have any rights to your wireless phone number, except for any right you may have to port it. After a line of service is disconnected, for any reason, the disconnected Mobile Telephone Number (MTN) may not be suspended or otherwise reserved and may not be able to be recovered.

**Can I have someone else manage my Postpay account?**
No problem – just tell us by phone, in person or in writing. You can appoint someone to manage your Postpay account. The person you appoint (the Account Manager) will be able to make changes to your account, including adding new lines of Service, buying a new wireless device(s) on a device payment agreement based upon your credit history, billing certain services and accessories to your account, and extending your contract term. Any changes that person makes will be treated as modifications to this Agreement.

**Can Verizon change this Agreement or my Service?**
We may change prices or any other term of your Service or this Agreement at any time, but we'll provide notice first, including written notice if you have Postpay Service. If you use your Service after the change takes effect, that means you're accepting the change. If you're a Postpay customer and a change to your Plan or this Agreement has a material adverse effect on you, you can cancel the line of Service that has been affected within 60 days of receiving the notice with no early termination fee if we fail to negate the change after you notify us of your objection to it. Notwithstanding this provision, if we make any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change.

**My wireless device**
Your wireless device must comply with Federal Communications Commission regulations, be certified for use on our network and be compatible with your Service. Please be aware that we may change your wireless device's software, applications or programming remotely, without notice. This could affect your stored data, or how you've programmed or use your wireless device. By activating Service that uses a SIM (Subscriber Identity Module) card, you agree we own the intellectual property and software in the SIM card, that we may change the software or other data in the SIM card remotely and without notice, and we may utilize any capacity in the SIM card for administrative, network, business and/or commercial purposes. In order to mitigate theft and other fraudulent activity, newly purchased devices may be locked to work exclusively on the Verizon Network for 60 days. For more information, visit verizon.com/support/device-unlocking-policy.

**Internet access**
If you download or use applications, services or software provided by third parties (including voice applications), 911 or E911, or other calling functionality, may work differently than services offered by us or may not work at all. Please review all terms and conditions of such third-party products. Verizon Wireless is not responsible for any third-party information, content, applications or services you access, download or use on your device. You are responsible for maintaining virus and other internet security protections when accessing these third-party products or services. For additional information, visit the Verizon Content Policy at verizon.com/about/our-company/company-policies. To learn about content filtering and how you may block materials harmful to minors, visit vzw.com/solutions-and-services/content-filters/. For information about our network management practices for our broadband internet access services, visit verizon.com/about/our-company/open-internet.

**Where and how does Verizon wireless Service work?**
Wireless devices use radio transmissions, so unfortunately you can't get Service if your device isn't in range of a transmission signal. And please be aware that even within your Coverage Area, many things can affect the availability and quality of your Service, including network capacity, your device, terrain, buildings, foliage and weather.

**How does Verizon calculate my charges?**
You agree to pay all access, usage and other charges that you or any other user of your wireless device incurred. If multiple wireless devices are associated with your account, you agree to pay all charges incurred by users of those wireless devices. For charges based on the amount of time used or data sent or received, we'll round up any fraction to the next full minute or, depending on how you're billed for data usage, the next full megabyte or gigabyte. For outgoing calls, usage time starts when you first press **Send** or the call connects to a network, and for incoming calls, it starts when the call connects to a network (which may be before it rings). Usage time may end several seconds after you press **End** or after the call disconnects. For calls made on our network, we charge only for calls that are answered, including by machines. For Postpay Service, usage cannot always be processed right away and may be included in a later bill, but the usage will still count toward your allowance for the month when the Service was used.

**What charges are set by Verizon?**
Our charges may also include Federal Universal Service, Regulatory and Administrative Charges, and we may also include other charges related to our governmental costs. We set these charges; they aren't taxes, they aren't required by law, they are not necessarily related to anything the government does, they are kept by us in whole or in part, and the amounts and what they pay for may change. For more information, visit verizon.com/support/surcharges/.

**Government taxes, fees and surcharges**
You must pay all taxes, fees and surcharges set by federal, state and local governments. Please note that we may not always be able to notify you in advance of changes to these charges.

**What is roaming?**
You're "roaming" whenever your wireless device connects to a network outside your Coverage Area or connects to another carrier's network, which could happen even within your Coverage Area. There may be higher rates or extra charges (including charges for long distance, tolls or calls that don't connect), and your data service may be limited or slowed when roaming.

**How can I prevent unintended charges on my bill or block spam calls?**
Many services and applications are accessible on or through wireless devices, including purchases of games, movies, music and other content. Some of these services are provided

by Verizon. Others are provided by third parties that may offer the option to bill the charges to your Verizon bill or other methods of payment. Charges may be one-time or recurring. The amount and frequency of the charges will be disclosed to you or the person using your device or a device associated with your account at the time a purchase is made. If the purchaser chooses to have the charges billed to your account, such charges will become part of the amount due for that billing cycle. Verizon offers tools to block or restrict these services, and to block all billing for third-party services on your Verizon wireless bill, at verizon.com/myverizon. We do not support calls to 900, 976 and certain other international premium rate numbers.

Verizon automatically blocks in the network many calls that are highly likely to be illegal, such as calls from telephone numbers that are not authorized to make outbound calls. Additionally, your Service includes access to optional blocking tools for unwanted robocalls through our Call Filter service to which you may be auto-enrolled. This service sends to voicemail many calls we determine to be high-risk spam, but you can adjust your spam filter preferences to block more or less calls. Visit verizon.com/about/responsibility/robocalls for more info.

**How and when can I dispute charges?**
If you're a Postpay customer, you can dispute your bill within 180 days of receiving it, but unless otherwise provided by law or unless you're disputing charges because your wireless device was lost or stolen, you still have to pay all charges until the dispute is resolved. If you're a Prepaid customer, you can dispute a charge within 180 days of the date the disputed charge was incurred. **YOU MAY CALL US TO DISPUTE CHARGES ON YOUR BILL OR ANY SERVICE(S) FOR WHICH YOU WERE BILLED, BUT IF YOU WISH TO PRESERVE YOUR RIGHT TO BRING AN ARBITRATION OR SMALL CLAIMS CASE REGARDING SUCH DISPUTE, YOU MUST WRITE TO US AT THE CUSTOMER SERVICE ADDRESS ON YOUR BILL, OR SEND US A COMPLETED NOTICE OF DISPUTE FORM (AVAILABLE AT VERIZON.COM), WITHIN THE 180-DAY PERIOD MENTIONED ABOVE. IF YOU DO NOT NOTIFY US IN WRITING OF SUCH DISPUTE WITHIN THE 180-DAY PERIOD, YOU WILL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL OR SUCH SERVICE(S) AND TO BRING AN ARBITRATION OR SMALL CLAIMS CASE REGARDING ANY SUCH DISPUTE.**

**What are my rights for dropped calls or interrupted Service?**
If you drop a call in your Coverage Area, redial. If it's answered within 5 minutes, call us within 90 days if you're a Postpay customer or within 45 days if you're a Prepaid customer, and we'll give you a 1-minute airtime credit. If you're a Postpay customer and you lose Service in your Coverage Area for more than 24 hours in a row and we're at fault, call us within 180 days and we'll give you a credit for the time lost. Please be aware that these are your only rights for dropped calls or interrupted Service.

**Billing and payments**
If you're a Postpay customer and we don't get your payment on time, we will charge you a late fee of up to 1.5% per month (18% per year) on the unpaid balance, or a flat $5 per month, whichever is greater, if allowed by law in the state of your billing address. (If you choose to have your Service billed by another company [pursuant to a Verizon-approved program], late fees are set by that company and may be higher than our late fees.) Late fees are part of the rates and charges you agree to pay. If you fail to pay on time and we refer your account(s) to a third party for collection, a collection fee will be assessed and will be due at the time of the referral to the third party. The fee will be calculated at the maximum percentage permitted by applicable law, not to exceed 18%. We may require a deposit at the time of activation or afterward, or an increased deposit. We'll pay simple interest on any deposit at the rate the law requires. We may apply deposits or payments in any order to any amounts you owe us on any account. If your final credit balance is less than $1, we will refund it only if you ask. If your service is suspended or terminated, you may have to pay a fee to have service reactivated.

If you're a Prepaid customer, you may replenish your balance at any time before the expiration date by providing us with another payment. If you maintain a Prepaid account balance, it may not exceed $1,000 and you may be prevented from replenishing if your balance reaches $1,000. We may apply your payments to any amounts you may owe us if your earlier account replenishment payments had been reversed. If you do not have sufficient funds in your account to cover your Service, and sufficient funds are not added within 60 days, your account will be canceled and any unused balance will be forfeited.

We may charge you up to $25 for any returned check. The substantive laws of Pennsylvania shall be applied to disputes related to checks tendered as payment in full for less than the

full balance due, without regard to the conflicts of laws and rules of that state. If you make a payment, or make a payment arrangement, through a call center representative, we may charge you an Agent Assistance Fee.

**What if my wireless device gets lost or stolen?**
We're here to help. It's important that you notify us right away, so we can suspend your Service to keep someone else from using it. If you're a Postpay customer and your wireless device is used after the loss or theft but before you report it, and you want a credit for any charges for that usage, we're happy to review your account activity and any other information you'd like us to consider. Keep in mind that you may be held responsible for the charges if you delayed reporting the loss or theft without good reason, but you don't have to pay any charges you dispute while they are being investigated. If you are a California customer and we haven't given you a courtesy suspension of recurring monthly charges during the past year, we'll give you one for 30 days or until you replace or recover your wireless device, whichever comes first.

**What are Verizon's rights to limit or end Service or end this Agreement?**
We can, without notice, limit, suspend or end your Service or any agreement with you for any good cause, including, but not limited to: (1) if you: (a) breach this agreement or violate our prohibited usage policies; (b) resell your Service; (c) use your Service for any illegal purpose, including use that violates trade and economic sanctions and prohibitions promulgated by any US governmental agency; (d) install, deploy or use any regeneration equipment or similar mechanism (for example, a repeater) to originate, amplify, enhance, retransmit or regenerate an RF signal without our permission; (e) steal from or lie to us; or, if you're a Postpay customer; (f) do not pay your bill on time; (g) incur charges larger than a required deposit or billing limit, or materially in excess of your monthly access charges (even if we haven't yet billed the charges); (h) provide credit information we can't verify; (i) are unable to pay us or go bankrupt; or (j) default under any device financing agreement with Verizon; or (2) if you, any user of your device or any line of service on your account, or any account manager on your account: (a) threaten, harass, or use vulgar and/or inappropriate language toward our representatives; (b) interfere with our operations; (c) "spam," or engage in other abusive messaging or calling; (d) modify your device from its manufacturer's specifications; or (e) use your Service in a way that negatively affects our network or other customers. We can also temporarily limit your Service for any operational or governmental reason.

**Am I eligible for special discounts?**
If you're a Postpay customer, you may be eligible for a discount if you are and remain affiliated with an organization that has an agreement with us. Unless your discount is through a government employee discount program, we may share certain information about your Service (including your name, your wireless telephone number and your total monthly charges) with your organization from time to time to make sure you're still eligible. We may adjust or remove your discount according to your organization's agreement with us, and remove your discount if your eligibility ends or your contract term expires. In any case, this won't be considered to have a material adverse effect on you.

**DISCLAIMER OF WARRANTIES**
We make no representations or warranties, express or implied, including, to the extent permitted by applicable law, any implied warranty of merchantability or fitness for a particular purpose, about your Service, your wireless device, or any applications you access through your wireless device. We do not warrant that your wireless device will work perfectly or will not need occasional upgrades or modifications, or that it will not be negatively affected by network-related modifications, upgrades or similar activity.

**WAIVERS AND LIMITATIONS OF LIABILITY**
You and Verizon both agree to limit claims against each other solely to direct damages. That means neither of us will claim any damages that are indirect, special, consequential, incidental, treble or punitive. For example, disallowed damages include those arising out of a Service or device failure, unauthorized access or changes to your account or device, or the use of your account or device by others to authenticate, access or make changes to a third-party account, such as a financial or cryptocurrency account, including changing passwords or transferring or withdrawing funds. This limitation and waiver will apply regardless of the theory of liability. It also applies if you bring a claim against one of our suppliers, to the extent we would be required to indemnify the supplier for the claim. You agree we aren't responsible for problems caused by you or others, or by any act of God. You also agree we aren't liable for missed or deleted voicemails or other messages, or for

any information (like pictures) that gets lost or deleted if we work on your device. If another wireless carrier is involved in any problem (for example, while you're roaming), you also agree to any limitations of liability that it imposes.

**HOW DO I RESOLVE DISPUTES WITH VERIZON?**
WE HOPE TO MAKE YOU A HAPPY CUSTOMER, BUT IF THERE'S AN ISSUE THAT NEEDS TO BE RESOLVED, THIS SECTION OUTLINES WHAT'S EXPECTED OF BOTH OF US.

YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT, AS DISCUSSED BELOW. YOU UNDERSTAND THAT BY THIS AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY. WHILE THE PROCEDURES IN ARBITRATION MAY BE DIFFERENT, AN ARBITRATOR CAN AWARD YOU THE SAME DAMAGES AND RELIEF, AND MUST HONOR THE SAME TERMS IN THIS AGREEMENT, AS A COURT WOULD. IF THE LAW ALLOWS FOR AN AWARD OF ATTORNEYS' FEES, AN ARBITRATOR CAN AWARD THEM TOO. THE SAME DEFENSES ARE ALSO AVAILABLE TO BOTH PARTIES AS WOULD BE AVAILABLE IN COURT, INCLUDING ANY APPLICABLE STATUTE OF LIMITATIONS. WE ALSO BOTH AGREE THAT:

(1) THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. EXCEPT FOR SMALL CLAIMS COURT CASES, ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT, OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US, OR FROM ANY ADVERTISING FOR ANY SUCH PRODUCTS OR SERVICES, OR FROM OUR EFFORTS TO COLLECT AMOUNTS YOU MAY OWE US FOR SUCH PRODUCTS OR SERVICES, INCLUDING ANY DISPUTES YOU HAVE WITH OUR EMPLOYEES OR AGENTS, WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB"). YOU CAN ALSO BRING ANY ISSUES YOU MAY HAVE TO THE ATTENTION OF FEDERAL, STATE OR LOCAL GOVERNMENT AGENCIES, AND IF THE LAW ALLOWS, THEY CAN SEEK RELIEF AGAINST US FOR YOU. THIS AGREEMENT TO ARBITRATE CONTINUES TO APPLY EVEN AFTER YOU HAVE STOPPED RECEIVING SERVICE FROM US.

(2) UNLESS YOU AND VERIZON AGREE OTHERWISE, THE ARBITRATION WILL TAKE PLACE IN THE COUNTY OF YOUR BILLING ADDRESS. FOR CLAIMS OVER $10,000, THE AAA'S CONSUMER ARBITRATION RULES WILL APPLY. FOR CLAIMS OF $10,000 OR LESS, THE PARTY BRINGING THE CLAIM CAN CHOOSE EITHER THE AAA'S CONSUMER ARBITRATION RULES OR THE BBB'S RULES FOR BINDING ARBITRATION. YOU CAN GET PROCEDURES, RULES AND FEE INFORMATION FROM THE AAA (WWW.ADR.ORG), THE BBB (WWW.BBB.ORG) OR FROM US. FOR CLAIMS OF $10,000 OR LESS, YOU CAN CHOOSE WHETHER YOU'D LIKE THE ARBITRATION CARRIED OUT BASED ONLY ON DOCUMENTS SUBMITTED TO THE ARBITRATOR, OR BY A HEARING IN PERSON OR BY PHONE. ALTERNATIVELY, FOR CLAIMS WITHIN THE JURISDICTIONAL LIMIT OF THE SMALL CLAIMS COURT IN THE STATE ENCOMPASSING YOUR BILLING ADDRESS, EITHER YOU OR VERIZON CAN CHOOSE TO BRING AN INDIVIDUAL ACTION IN SMALL CLAIMS COURT INSTEAD OF PROCEEDING IN ARBITRATION; FURTHERMORE, IF THE CLAIMS IN ANY REQUEST OR DEMAND FOR ARBITRATION COULD HAVE BEEN BROUGHT IN SMALL CLAIMS COURT, THEN EITHER YOU OR VERIZON MAY CHOOSE TO HAVE THE CLAIMS HEARD IN SMALL CLAIMS COURT, RATHER THAN IN ARBITRATION, AT ANY TIME BEFORE THE ARBITRATOR IS APPOINTED, BY NOTIFYING THE OTHER PARTY OF THAT CHOICE IN WRITING. IF THIS PROVISION OR THE LIMITATION ON BRINGING ACTIONS TO SMALL CLAIMS COURT IS FOUND TO BE INVALID, THEN THIS PROVISION SHALL BE SEVERABLE AND THE MATTER WILL PROCEED IN ARBITRATION; IN NO WAY WILL THIS PROVISION ALLOW FOR AN ACTION TO BE BROUGHT ON A CLASS OR COLLECTIVE BASIS.

(3) THIS AGREEMENT DOESN'T ALLOW CLASS OR COLLECTIVE ARBITRATIONS EVEN IF THE AAA OR BBB PROCEDURES OR RULES WOULD. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE ARBITRATOR MAY AWARD MONEY OR INJUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM. NO CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL OR GENERAL INJUNCTIVE RELIEF THEORIES OF LIABILITY OR PRAYERS FOR RELIEF MAY BE MAINTAINED IN ANY ARBITRATION HELD UNDER THIS AGREEMENT. ANY QUESTION REGARDING THE ENFORCEABILITY OR INTERPRETATION OF THIS PARAGRAPH SHALL BE DECIDED BY A COURT AND NOT THE ARBITRATOR.

(4) IF EITHER OF US INTENDS TO SEEK ARBITRATION UNDER THIS AGREEMENT, THE PARTY SEEKING ARBITRATION MUST FIRST NOTIFY THE OTHER PARTY OF THE DISPUTE IN WRITING AT LEAST 60 DAYS IN ADVANCE OF INITIATING THE ARBITRATION. NOTICE TO VERIZON SHOULD BE SENT TO VERIZON WIRELESS DISPUTE RESOLUTION MANAGER, ONE VERIZON WAY, BASKING RIDGE, NJ 07920. THE NOTICE MUST INCLUDE ENOUGH INFORMATION TO ALLOW US TO IDENTIFY YOUR ACCOUNT AS WELL AS TO ASSESS AND ATTEMPT TO RESOLVE YOUR CLAIM, INCLUDING THE NAME OF THE VERIZON WIRELESS ACCOUNT HOLDER, THE MOBILE TELEPHONE NUMBER AT ISSUE, A DESCRIPTION OF THE CLAIM, THE SPECIFIC FACTS SUPPORTING THE CLAIM, THE DAMAGES YOU CLAIM TO HAVE SUFFERED AND THE RELIEF YOU ARE SEEKING. THE NOTICE REQUIREMENT IS DESIGNED TO ALLOW VERIZON TO MAKE A FAIR, FACT-BASED OFFER OF SETTLEMENT IF IT CHOOSES TO DO SO. YOU CANNOT PROCEED TO ARBITRATION UNLESS YOU PROVIDE THIS INFORMATION. YOU MAY CHOOSE TO BE REPRESENTED BY AN ATTORNEY OR OTHER PERSON AS PART OF THIS PROCESS, BUT IF YOU DO YOU MUST SUBMIT A LETTER OR THE FORM AVAILABLE AT THIS LINK AUTHORIZING US TO DISCUSS YOUR ACCOUNT INFORMATION WITH THIS ATTORNEY OR OTHER PERSON. THE SUFFICIENCY OF THIS NOTICE IS AN ISSUE TO BE DECIDED BY A COURT PRIOR TO THE FILING OF ANY DEMAND FOR ARBITRATION. IF YOU HAVE PROVIDED THIS INFORMATION AND WE ARE UNABLE TO RESOLVE OUR DISPUTE WITHIN 60 DAYS, EITHER PARTY MAY THEN PROCEED TO FILE A CLAIM FOR ARBITRATION. WE'LL REIMBURSE ANY FILING FEE THAT THE AAA OR BBB CHARGES YOU FOR ARBITRATION OF THE DISPUTE AT THE CONCLUSION OF THE ARBITRATION IF YOU FULLY PARTICIPATE IN THE PROCEEDING. WE'LL ALSO PAY ANY ADMINISTRATIVE AND ARBITRATOR FEES CHARGED BY THE ARBITRATION TRIBUNAL. IF THE ARBITRATOR DETERMINES THAT YOUR CLAIM WAS FILED FOR PURPOSES OF HARASSMENT OR IS PATENTLY FRIVOLOUS, THE ARBITRATOR WILL REQUIRE YOU TO REIMBURSE VERIZON FOR ANY FILING, ADMINISTRATIVE OR ARBITRATOR FEES ASSOCIATED WITH THE ARBITRATION.

(5) WE MAY, BUT ARE NOT OBLIGATED TO, MAKE A WRITTEN SETTLEMENT OFFER ANYTIME BEFORE THE ARBITRATION HEARING. THE AMOUNT OR TERMS OF ANY SETTLEMENT OFFER MAY NOT BE DISCLOSED TO THE ARBITRATOR UNTIL AFTER THE ARBITRATOR ISSUES AN AWARD ON THE CLAIM. IF YOU DON'T ACCEPT THE OFFER AND THE ARBITRATOR AWARDS YOU AN AMOUNT OF MONEY THAT'S MORE THAN OUR OFFER BUT LESS THAN $5,000, OR IF WE DON'T MAKE YOU AN OFFER, AND THE ARBITRATOR AWARDS YOU ANY AMOUNT OF MONEY BUT LESS THAN $5,000, THEN WE AGREE TO PAY YOU $5,000 INSTEAD OF THE AMOUNT AWARDED. IN THAT CASE WE ALSO AGREE TO PAY ANY REASONABLE ATTORNEYS' FEES AND EXPENSES, REGARDLESS OF WHETHER THE LAW REQUIRES IT FOR YOUR CASE. IF THE ARBITRATOR AWARDS YOU MORE THAN $5,000, THEN WE WILL PAY YOU ONLY THAT AMOUNT.

(6) IF 25 OR MORE CUSTOMERS INITIATE NOTICES OF DISPUTE WITH VERIZON WIRELESS RAISING SIMILAR CLAIMS, AND COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS BRINGING THE CLAIMS ARE THE SAME OR COORDINATED FOR THESE CUSTOMERS, THE CLAIMS SHALL PROCEED IN ARBITRATION IN A COORDINATED PROCEEDING. COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS AND COUNSEL FOR VERIZON WIRELESS SHALL EACH SELECT FIVE CASES TO PROCEED FIRST IN ARBITRATION IN A BELLWETHER PROCEEDING. THE REMAINING CASES SHALL NOT BE FILED IN ARBITRATION UNTIL THE FIRST TEN HAVE BEEN RESOLVED. IF THE PARTIES ARE UNABLE TO RESOLVE THE REMAINING CASES AFTER THE CONCLUSION OF THE BELLWETHER PROCEEDING, EACH SIDE MAY SELECT ANOTHER FIVE CASES TO PROCEED TO ARBITRATION FOR A SECOND BELLWETHER PROCEEDING. THIS PROCESS MAY CONTINUE UNTIL THE PARTIES ARE ABLE TO RESOLVE ALL OF THE CLAIMS, EITHER THROUGH SETTLEMENT OR ARBITRATION. A COURT WILL HAVE AUTHORITY TO ENFORCE THIS CLAUSE AND, IF NECESSARY, TO ENJOIN THE MASS FILING OF ARBITRATION DEMANDS AGAINST VERIZON.

(7) AN ARBITRATION AWARD AND ANY JUDGMENT CONFIRMING IT APPLY ONLY TO THAT SPECIFIC CASE; IT CAN'T BE USED IN ANY OTHER CASE EXCEPT TO ENFORCE THE AWARD ITSELF.

**(8) IF FOR SOME REASON THE PROHIBITION ON CLASS ARBITRATIONS SET FORTH IN SUBSECTION (3) CANNOT BE ENFORCED AS TO ALL OR PART OF A DISPUTE, THEN THE AGREEMENT TO ARBITRATE WILL NOT APPLY TO THAT DISPUTE OR PART OF THE DISPUTE.**

**(9) IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN THROUGH ARBITRATION, YOU AND VERIZON AGREE THAT THERE WILL NOT BE A JURY TRIAL. YOU AND VERIZON UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY WAY. IN THE EVENT OF LITIGATION, THIS PARAGRAPH MAY BE FILED TO SHOW A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**About this Agreement**
If either you or we don't enforce our rights under this agreement in one instance, that doesn't mean you or we won't or can't enforce those rights in any other instance. You cannot assign this Agreement or any of your rights or duties under it without our permission. However, we may assign this Agreement or any debt you owe us without notifying you. **If you're a Postpay customer, please note that many notices we send to you will show up as messages on your monthly bill. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. If we send other notices to you, they will be considered received immediately if we send them to your wireless device, or to any email or fax number you've given us, or after three days if we mail them to your billing address. If you need to send notices to us, please send them to the customer service address on your latest bill.**

**If you're a Prepaid customer and we send notices to you, they will be considered received immediately if we send them to your wireless device or to any email you've given us, or if we post them as a precall notification on your Service, or after three days if we mail them to the most current address we have for you. If you need to send notices to us, please send them to the Customer Service Prepaid address at verizon.com/contactus.**

**If any part of this agreement, including anything regarding the arbitration process (except for the prohibition on class arbitrations as explained in part 8 of the dispute resolution section above), is ruled invalid, that part may be removed from this agreement.**

**This agreement and the documents it incorporates form the entire agreement between us. You can't rely on any other documents, or on what's said by any Sales or Customer Service Representatives, and you have no other rights regarding Service or this agreement.** This Agreement isn't for the benefit of any third party except our parent companies, affiliates, subsidiaries, agents, and predecessors and successors in interest. Except where we've agreed otherwise elsewhere in this agreement, this agreement and any disputes covered by it are governed by federal law and the laws of the state encompassing the area code of your wireless phone number when you accepted this agreement, without regard to the conflicts of laws and rules of that state.

Updated October 20, 2021

EXHIBIT B

2022 WL 2390997
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Teresa MACCLELLAND, et al., Plaintiffs,
v.
CELLCO PARTNERSHIP, et al., Defendants.

Case No. 21-cv-08592-EMC
|
Signed July 1, 2022

**Synopsis**
**Background:** Customers, individually, as private attorneys general, and on behalf of putative class of other customers similarly situated, filed action alleging that wireless service provider engaged in false advertising by failing to disclose "Administrative Charge" for wireless services, and misrepresenting that fee was tax or government regulation. Provider moved to compel arbitration.

**Holdings:** The District Court, Edward M. Chen, J., held that:

[1] customer agreement did not clearly and unmistakably delegate to arbitrator of authority to decide issues of contract validity;

[2] agreement's 180-day notice requirement for disputes related to charges on customer's bill was substantively unconscionable;

[3] provision prohibiting punitive damages was substantively unconscionable;

[4] provision prohibiting public injunctive relief was substantively unconscionable;

[5] provision prohibiting extrinsic evidence to be considered was substantively unconscionable;

[6] agreement's mass arbitration provision was substantively unconscionable;

[7] post-suit amendment to agreement was inapplicable; and

[8] arbitration provision was permeated by unconscionability, and thus was unenforceable in its entirety.

Motion denied.

**Procedural Posture(s):** Motion to Compel Arbitration.

West Headnotes (36)

**[1]** **Alternative Dispute Resolution** 🔑 Validity
Federal Arbitration Act's (FAA) saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from fact that agreement to arbitrate is at issue. 9 U.S.C.A. § 2.

1 Case that cites this headnote

**[2]** **Alternative Dispute Resolution** 🔑 Existence and validity of agreement
**Alternative Dispute Resolution** 🔑 Arbitrability of dispute
In ruling on motion to compel arbitration, district court must decide (1) whether valid agreement to arbitrate exists and, if it does, (2) whether agreement encompasses dispute at issue; if response is affirmative on both counts, then absent application of savings clause, Federal Arbitration Act (FAA) requires court to enforce arbitration agreement in accordance with its terms. 9 U.S.C.A. § 2.

**[3]** **Alternative Dispute Resolution** 🔑 Arbitrability of dispute
In general, whether court or arbitrator decides arbitrability is issue for judicial determination unless parties clearly and unmistakably provide otherwise.

**[4]** **Alternative Dispute Resolution** 🔑 Evidence
There is no presumption in favor of arbitration of arbitrability.

1 Case that cites this headnote

**[5]    Alternative Dispute Resolution** 🔑 Evidence

Clear and unmistakable evidence of agreement to arbitrate arbitrability might include course of conduct demonstrating assent or express agreement to do so.

**[6]    Alternative Dispute Resolution** 🔑 Arbitrability of dispute

Incorporation of American Arbitration Association (AAA) rules into arbitration provision of wireless service provider's customer agreement was not clear and unmistakable delegation to arbitrator of authority to decide issues of contract validity; agreement provided that for claims of $10,000 or less, party bringing claim could choose either AAA's rules or Better Business Bureau's (BBB) rules, AAA rules were not quoted or appended to agreement, BBB rules did not contain explicit delegation clause, and common customers could not be expected to understand that incorporation by reference of AAA rules—without spelling out actual provision—would mean that arbitration provision's validity and enforceability would be resolved by arbitrator rather than court. 9 U.S.C.A. § 2.

**[7]    Federal Courts** 🔑 Alternative dispute resolution

Federal courts apply state contract law to determine arbitration agreement's enforceability.

**[8]    Contracts** 🔑 Procedural unconscionability
**Contracts** 🔑 Substantive unconscionability

Under California law, contractual provision is unenforceable if it is both procedurally and substantively unconscionable; the lesser the procedural unconscionability, the greater substantive unconscionability must be shown, and vice versa.

**[9]    Contracts** 🔑 Procedural unconscionability
**Contracts** 🔑 Substantive unconscionability

Under California law, when evaluating contract's procedural unconscionability, courts focus on oppression or surprise that results from unequal bargaining power; while evaluating substantive unconscionability, courts are more concerned with overly harsh or one-sided results.

**[10]    Contracts** 🔑 Severability

Under California law, if court determines that any contractual provisions are unconscionable, court must then decide whether unconscionable provisions are severable from rest of contract.

**[11]    Contracts** 🔑 Procedural unconscionability

Under California law, procedural unconscionability concerns manner in which contract was negotiated and parties' respective circumstances at that time, focusing on level of oppression and surprise involved in agreement.

**[12]    Contracts** 🔑 Procedural unconscionability

Oppression, for purposes of procedural unconscionability under California law, addresses weaker party's absence of choice and unequal bargaining power that results in no real negotiation.

**[13]    Contracts** 🔑 Procedural unconscionability

Surprise, for purposes of procedural unconscionability under California law, involves extent to which contract clearly discloses its terms as well as weaker party's reasonable expectations.

**[14]    Alternative Dispute Resolution** 🔑 Unconscionability

Under California law, arbitration agreement is at least minimally procedurally unconscionable if it is contract of adhesion.

1 Case that cites this headnote

**[15]** **Contracts** 🔑 Adhesion contracts; standardized contracts

**Contracts** 🔑 Procedural unconscionability

Under California law, contract is procedurally unconscionable if it is "contract of adhesion," i.e., standardized contract, drafted by party of superior bargaining strength, that relegates to subscribing party only opportunity to adhere to contract or reject it.

**[16]** **Alternative Dispute Resolution** 🔑 Unconscionability

Finding of procedural unconscionability alone is not enough to deny motion to compel arbitration under California law.

**[17]** **Contracts** 🔑 Substantive unconscionability

Under California law, substantive unconscionability focuses on terms of agreement and whether those are overly harsh or one-sided.

**[18]** **Limitation of Actions** 🔑 Agreements as to period of limitation

Under California law, contractual agreements to shorten statute of limitations period are generally disfavored because they derogate statutory intent.

**[19]** **Alternative Dispute Resolution** 🔑 Unconscionability

Contractual clause restricting the period in which arbitration may be commenced is unconscionable where period is far shorter than that otherwise available under California law.

**[20]** **Alternative Dispute Resolution** 🔑 Unconscionability

Under California law, provision of wireless service provider's customer agreement imposing 180-day notice requirement for disputes related to charges on customer's bill was substantively unconscionable to some degree, even though provision was not contractual limitations provision; customer who failed to notify provider within 180-day notice window—because, e.g., they were unaware of contractual provision that had no precedent in California Civil Code —would forfeit her right to bring suit, and applicable limitations periods ranged from three to four years.

**[21]** **Jury** 🔑 Form and sufficiency of waiver

Under California law, pre-dispute jury trial waivers are invalid unless expressly authorized by statute.

1 Case that cites this headnote

**[22]** **Alternative Dispute Resolution** 🔑 Unconscionability

Under California law, provision of wireless service provider's customer agreement prohibiting arbitrator from awarding punitive damages, which were otherwise available under Consumer Legal Remedies Act (CLRA), was substantively unconscionable. Cal. Civ. Code § 1780(a)(4).

**[23]** **Contracts** 🔑 Agreements relating to actions and other proceedings in general

Under California law, contractual provision purporting to waive right to seek public injunctive relief in any forum is unenforceable.

1 Case that cites this headnote

**[24]** **Contracts** 🔑 Agreements relating to actions and other proceedings in general

To qualify as "public injunctive relief" for purposes of California rule prohibiting waiver

of such relief, injunction must be for benefit of general public as a whole, as opposed to particular class of persons.

1 Case that cites this headnote

**[25]  Alternative Dispute Resolution**  Unconscionability

Provision of wireless service provider's customer agreement permitting arbitrator to award injunctive relief only in favor of individual party seeking relief and only to extent necessary to provide relief warranted by that party's individual claim was substantively unconscionable, and thus unenforceable under California rule prohibiting waiver of public injunctive relief.

1 Case that cites this headnote

**[26]  Evidence**  Contracts and agreements in general

Under California law, evidence extrinsic to contract is always permissible to prove fraud in inducement of contract pursuant to both common and statutory law.

**[27]  Telecommunications**  Contracts for service

Under California law, provision of wireless service provider's customer agreement prohibiting consideration of extrinsic evidence under any circumstances, including to show fraud, was substantively unconscionable.

**[28]  Contracts**  Unconscionable Contracts

Under California law, in assessing unconscionability, court must examine contractual provision's validity as of time contract is made; it is prospective analysis that does not require proof that particular plaintiff has already been adversely affected.

**[29]  Alternative Dispute Resolution**  Unconscionability

Under California law, wireless service provider's customer agreement's mass arbitration provision—which set cap of ten cases involving customers represented by same counsel asserting similar claims that could proceed to arbitration at one time—was substantively unconscionable as applied to firm had been retained by 2,712 separate clients; average disposition time for arbitration took slightly under seven months, resulting in possible delays of 156 years, agreement preserved provider's right to raise statute of limitations defense in arbitration, clause contained no tolling provision, and there was no prohibition on provider's use of same law firm to represent it in all of its arbitrations.

**[30]  Alternative Dispute Resolution**  Modification or termination

Under California law, amendment to wireless service provider's customer agreement to permit tolling of statute of limitations until completion of arbitration of prior claims pursuant to agreement's mass arbitration provision was inapplicable in action challenging mass arbitration provision's validity; agreement specifically provided that "if [provider] make[s] any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change."

**[31]  Contracts**  Severability

Under California law, court has discretion to sever or limit unconscionable clauses. Cal. Civ. Code § 1670.5(a).

**[32]  Alternative Dispute Resolution**  Severability

Under California law, in determining whether severance of unconscionable provision in contract is appropriate, court may consider: (1) whether substantively unconscionable provision relates to arbitration agreement's chief objective; (2) whether arbitration agreement contained multiple substantively unconscionable

provisions such that it indicates systematic effort to impose arbitration not simply as alternative to litigation, but as inferior forum; and (3) lack of mutuality that permeated entire agreement. Cal. Civ. Code § 1670.5(a).

**[33]    Contracts**  🔑  Partial Illegality

Under California law, severability clauses evidence parties' intent that, to extent possible, valid provisions of contracts be given effect, even if some provision is found to be invalid or unlawful.

**[34]    Contracts**  🔑  Severability

Under California law, existence of severability clauses does not change fact that where agreement is permeated by unconscionability, court will not sever unlawful provisions. Cal. Civ. Code § 1670.5(a).

**[35]    Contracts**  🔑  Partial Illegality

Under California law, fact that severance can mechanically and grammatically be accomplished is not dispositive as to whether severance is appropriate. Cal. Civ. Code § 1670.5(a).

**[36]    Alternative Dispute Resolution**  🔑  Unconscionability

**Alternative Dispute Resolution**  🔑  Severability

Under California law, wireless service provider's customer agreement's arbitration provision was permeated by unconscionability, and thus was unenforceable in its entirety, even though agreement contained severance clause, and problematic provisions could be excised from agreement, leaving enough arbitration-related provisions for court to enforce; agreement created six-month window for notifying provider of claims, limitations of liability provision prevented customers from recovering punitive damages, public injunctive relief waiver

prevented them from raising claims protected by statute, exculpatory provision prevented them from relying on information provided to them, and mass arbitration provision meant that many customers could not arbitrate their claims for years and possibly ever. Cal. Civ. Code § 1670.5(a).

**Attorneys and Law Firms**

Paul Karl Lukacs, Hattis & Lukacs, Thousand Oaks, CA, Stephen DeNittis, Pro Hac Vice, DeNittis Osefchen Prince, P.C., Marlton, NJ, Che Corrington, Pro Hac Vice, Daniel Morley Hattis, Hattis and Lukacs, Bellevue, WA, for Plaintiffs.

Crystal Nix-Hines, Shon Morgan, Quinn Emanual Urquhart & Sullivan LLP, Los Angeles, CA, for Defendant Cellco Partnership.

Crystal Nix-Hines, Shon Morgan, Marina Lev, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, Los Angeles, CA, for Defendant Verizon Communications Inc.

**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS, AND DENYING DEFENDANTS' REQUEST FOR LEAVE TO FILE NOTIFICATION OF CHANGE TO CUSTOMER AGREEMENT**

Docket Nos. 20, 43

EDWARD M. CHEN, United States District Judge

**I. INTRODUCTION**

**\*1**  Plaintiffs, individually, as private attorneys general, and on behalf of a putative class of other customers similarly situated, allege that Defendants Cellco Partnership d/b/a Verizon Wireless and Verizon Communications Inc. (collectively, "Verizon"), engaged in false advertising by failing to disclose an "Administrative Charge" for wireless services, and misrepresenting that the fee is a tax or government regulation. Plaintiffs assert claims under California law pursuant to the Consumer Legal Remedies Act, False Advertising Law, and Unfair Competition Law

seeking public injunctive relief, private injunctive relief, and restitution.

Now pending is Verizon's motion to compel the entirety of the action to arbitration subject to an arbitration agreement that prohibits non-individualized relief. Docket No. 20 (Motion to Compel Arbitration, or "MTC"). For the following reasons, the Court **DENIES** Verizon's motion to compel arbitration.

## II. BACKGROUND

A. Summary of Allegations

In the operative complaint, Plaintiffs allege that Verizon has engaged, and continues to engage, in a false advertising scheme because Verizon publicly advertises flat monthly rates for its wireless service plans but then charges higher rates "by padding the bill with an invented and undisclosed" extra charge of $1.95 per month (which Verizon calls the "Administrative Charge"). *See* Docket No. 10 (First Amended Complaint or "FAC") ¶ 1. The FAC alleges that the "Administrative Charge" was concocted by Verizon beginning in September 2005 as a means to covertly increase customers' rates. *Id.* ¶¶ 1–2. Since 2005, Verizon has allegedly improperly collected over $1 billion in additional charges from its California subscribers through use of Administrative Charges. *Id.* ¶ 2.

Plaintiffs bring claims individually, as private attorneys general, and on behalf of a putative class consisting of "[a]ll individual consumers in California who currently subscribe or formerly subscribed to a postpaid wireless service plan from Verizon and were charged what Verizon labeled an 'Administrative Charge' within the applicable statutes of limitations." *Id.* ¶ 501. Plaintiffs bring claims under the Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*, False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq. Id.* ¶¶ 511–567. As an alternative to their statutory claims, Plaintiffs also bring a claim alleging breach of the implied covenant of good faith and fair dealing. *Id.* ¶ 569. The FAC seeks public injunctive relief to stop Verizon's allegedly ongoing false and deceptive price advertising to the general public under the UCL, FAL, and CLRA. *Id.* ¶¶ 531, 548, 566, Prayer § A. Under the CLRA, FAL, and UCL, Plaintiffs also seek, on behalf of themselves and the proposed class, restitution, damages, attorneys' fees, and a private injunction ordering Verizon to "adequately and accurately disclose to its subscribers the existence of the Administrative Charge, its true nature or basis, and its amount, including on all of Verizon's customer bills." Prayer § B, C.

B. Procedural Background

**\*2** On November 3, 2021, Plaintiffs Teresa MacClelland, Karen Umberger, and Scott Willits filed the complaint. Docket No. 1. On November 10, 2021, Plaintiffs sent a demand letter to Verizon that described their claims and this dispute. Docket No. 29 (Opposition to Motion to Compel, or "MTC Opp.") at 8. On December 31, 2021, Plaintiffs filed the operative FAC, adding 24 additional Plaintiffs. Docket No. 10. Verizon then moved to compel arbitration and stay proceedings. Docket No. 20. On May 19, 2022, the Court heard oral argument regarding Verizon's motion to compel arbitration. Docket No. 42. Almost three weeks later, Verizon requested leave to file a "notification of change" to Verizon's Customer Agreement ("Agreement") that addressed a statute of limitations issue that the Court had raised during the hearing. Docket No. 43. Plaintiffs then filed an opposition to Verizon's motion for leave. Docket No. 46. On June 23, 2022, the Court granted leave for the parties to submit supplemental briefing to address *Viking River Cruises, Inc. v. Moriana*, ⸺ U.S. ⸺, 142 S. Ct. 1906, ⸺ L.Ed.2d ⸺ (2022). Docket No. 50.

C. Arbitration Agreement

Before activating his or her wireless service, each plaintiff was required to accept the Agreement. Docket No. 21 (Declaration of Lacey Kennedy, or "Kennedy Decl.") ¶¶ 3–5. Over time, Verizon has made minor adjustments to its Agreement over time, but every version of the Agreement contained an arbitration clause that required arbitration and expressly prohibited class arbitrations. MTC at 3; Docket No. 21-1 (Agreement) ¶ 3.

Plaintiffs do not dispute that they assented to the arbitration agreement. MTC Opp. at 8. Nor do they contest Verizon's legal argument that their claims fall within the scope of the arbitration clause. *Id.* at 8. Instead, Plaintiffs argue that the dispute resolution provisions are permeated with unconscionability and are thus unenforceable. *Id.* at 8. The relevant provisions of the Agreement are excerpted and discussed below.

## III. LEGAL STANDARD

 **[1]**  Neither party disputes the application of the Federal Arbitration Act ("FAA"). Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The final clause of § 2, its saving clause, "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

## IV. DISCUSSION

 **[2]**  In ruling on a motion to compel arbitration, a district court must decide "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts, then [absent application of the savings clause] the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

Accordingly, the Court will first address whether there is an arbitration agreement between the parties.

### A. Whether An Agreement to Arbitrate Exists

The initial question of whether an agreement to arbitrate exists has a simple answer. Plaintiffs do not dispute that the Agreement, and its arbitration provision, constitute an agreement to which they assented. MTC Opp. at 8. Before activating his or her wireless service, each plaintiff was required to accept the Agreement. Kennedy Decl. ¶¶ 3–5. While Verizon has made minor adjustments to its Agreement over time, every version of the Agreement contained an arbitration clause that required arbitration and expressly prohibited class arbitrations. MTC at 3; Agreement ¶ 3.

Accordingly, an agreement to arbitrate exists.

### B. Whether Plaintiffs' Claims Are Covered By the Agreement

 **\*3**  The next question is whether Plaintiffs' claims are within the scope of the arbitration agreement. This again has a

straightforward answer—Plaintiffs do not contest Verizon's legal argument that their claims fall within the scope of the arbitration clause. MTC Opp. at 8.

Instead, Plaintiffs argue that the dispute resolution provisions are permeated with unconscionability and are thus unenforceable. *Id.* Verizon responds that the parties agreed to delegate the interpretation and enforcement of the Agreement to the arbitrator, so any questions of unconscionability must be determined by the arbitrator in the first instance. Reply at 2–3. The Court now turns to the threshold question of delegation of arbitrability.

### C. Delegation of Arbitrability

Verizon presents two arguments regarding the purported delegation of arbitrability. First, on reply, Verizon argues for the first time that all of Plaintiffs' arguments about contract invalidity must be decided in the first instance by the arbitrator given the arbitration provision's incorporation by reference of the AAA rules. *See* Reply at 1 (contending that the arbitration clause's incorporation of the AAA rules is "clear and unmistakable evidence" that the parties intended to delegate challenges to arbitrability to the arbitrator).

 **[3]**  **[4]**  **[5]**  In general, "whether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.' " *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (citation and internal quotation marks omitted). There is no presumption in favor of arbitration of arbitrability. *See, e.g., Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010) (explaining that unless the parties clearly and unmistakably provide otherwise, the gateway question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator); *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 208, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) ("Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court ..."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("If ... the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.") (emphasis in original). Courts, therefore, "apply a more rigorous standard" when determining whether arbitrability is a matter for the arbitrator pursuant to a delegation clause. *See Momot v. Mastro*, 652 F.3d 982, 987

(9th Cir. 2011). Clear and unmistakable evidence of an agreement to arbitrate arbitrability might include "a course of conduct demonstrating assent" or "an express agreement to do so." *Id.* at 988 (citation and internal quotation marks omitted).

The Ninth Circuit has held that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability; it has, however, expressly left open the question of whether this holding applies in the context of unsophisticated parties. *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015). Where at least one party is unsophisticated, courts in this district and elsewhere have routinely found that the incorporation of the AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate arbitrability. *See, e.g., Magill v. Wells Fargo Bank, N.A.*, No. 4:21-cv-01877-YGR, 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021) (holding that incorporation of the AAA rules does not clearly and unmistakably establish an agreement to delegate questions of arbitrability where one party was unsophisticated); *Ingalls v. Spotify USA, Inc.*, No. 16-cv-03533-WHA, 2016 WL 6679561, at *3–4 (N.D. Cal. Nov. 14, 2016) (noting that "every district court decision in our circuit to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegability in consumer contracts involving at least one unsophisticated party" and reasoning that unsophisticated parties to an arbitration agreement "could not be expected to appreciate the significance of incorporation of the AAA rules") (collecting cases); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) (same and noting that "[f]or an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity – a question the Supreme Court itself has deemed 'rather arcane' ") (citation omitted); *Money Mailer, LLC v. Brewer*, No. 15-cv-1215, 2016 WL 1393492, at *2 (W.D. Wash. Apr. 8, 2016) (determining that incorporation of AAA rules was not clear and unmistakable delegation where one party was unsophisticated).

**\*4  [6]**   The Court agrees with this holding. The Agreement states, "[f]or claims over $10,000, the AAA's consumer arbitration rules will apply." Agreement (Docket No. 21-1). AAA Consumer Arbitration Rule 14(a) in turn provides that "[t]he arbitrator shall have the power to rule on his or her

own jurisdiction, including any objections with respect to the existence, scope, or to validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Consumer Arbitration Rules at R-14(a). The AAA Rules are not quoted or appended to the Agreement. Common customers of Verizon, including Plaintiffs, should not be expected to understand that the incorporation by reference of the AAA rules—without spelling out the actual provision—would mean that the validity and enforceability of the arbitration provision would be resolved by an arbitrator rather than a court, a result contrary to common expectation. *Cf. First Options of Chicago*, 514 U.S. at 945, 115 S.Ct. 1920 ("[G]iven the principle that a party can be forced to arbitrate only those issues it has specifically agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."). This is especially true because the Agreement provides that for claims of $10,000 or less, the party bringing the claim can choose either the AAA's consumer arbitration rules or the BBB's rules for binding arbitration. *See* Agreement at 6. The BBB rules do *not* contain an explicit delegation clause. The Court thus finds there is not clear and unmistakable evidence that the parties agreed to arbitrate issues of arbitrability, particularly since it is not clear that the consumer would consider any individual claim to be worth over $10K.

Second, Verizon also argues that several of the provisions that Plaintiffs attack as substantively unconscionable are "fundamentally challenges to the enforceability of the Agreement itself, not the arbitration clause, and are therefore delegated to the arbitrator." MTC Reply at 2. Verizon is correct that some of the provisions in question—the 180-day notice period, the pre-dispute jury waiver, the punitive damages waiver, and the purported exculpatory clause—are located outside of the arbitration clause. *See* Agreement at 4–5, 8. But this argument "exalts form over substance. It places a dispositive premium upon the location of the objectionable clause—whether they are written within the arbitration paragraph or the paragraph preceding it—even though the arbitration clause clearly contemplates that all disputes will be resolved through arbitration and that these clauses would apply to arbitration." *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 726 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013). All but one of these provisions are functionally intertwined with the arbitration clause and thus

were anticipated to affect the scope of arbitration. The presumption that the Court decides arbitrability (and the terms affecting arbitrability) still obtains, and there is not clear and unmistakable evidence to the contrary.

The Court now turns to the question of whether the arbitration provisions are enforceable.

### D. Enforceability of the Arbitration Clause

**[7]**　**[8]**　**[9]**　**[10]** Plaintiffs argue that the arbitration agreement is both procedurally and substantively unconscionable and thus unenforceable. Courts apply state contract law to determine the enforceability of an arbitration agreement. *Pokorny v. Quixtar*, 601 F.3d 987, 994 (9th Cir. 2010). Under California law, "a contractual provision is unenforceable if it is both procedurally and substantively unconscionable." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 89, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000)). These two prongs operate on a sliding scale: the lesser the procedural unconscionability, the greater substantive unconscionability must be shown, and vice versa. *Armendariz*, 24 Cal. 4th at 89, 99 Cal.Rptr.2d 745, 6 P.3d 669. "When evaluating procedural unconscionability, courts focus on oppression or surprise that results from unequal bargaining power; while evaluating substantive unconscionability, courts are more concerned with overly harsh or one-sided results." *Klink v. ABC Phones of North Carolina*, No. 20-cv-06276-EMC, 2021 WL 3709167, at *9 (N.D. Cal. Aug. 20, 2021) (citing *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145, 163 Cal.Rptr.3d 269, 311 P.3d 184 (2013)). If the Court determines that any contractual provisions are unconscionable, the Court must then decide whether the unconscionable provisions are severable from the rest of the contract. *Armendariz*, 24 Cal. 4th at 121–122, 99 Cal.Rptr.2d 745, 6 P.3d 669.

#### 1. Procedural Unconscionability

Plaintiffs argue that the agreement is procedurally unconscionable because it is a contract of adhesion. MTC Opp. at 10.

**\*5**　**[11]**　**[12]**　**[13]** "Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co.*, 733

F.3d 916, 922 (9th Cir. 2013). "Oppression addresses the weaker party's absence of choice and unequal bargaining power that results in 'no real negotiation.' " *Id.* (internal quotation omitted). "Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party." *Id.*

**[14]**　**[15]** The arbitration agreement is at least minimally procedurally unconscionable if it is a contract of adhesion. *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). As explained in *Ting*, "[a] contract is procedurally unconscionable if it is a contract of adhesion, *i.e.*, a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id.* Here, Verizon drafted the Agreement and presented it to Plaintiffs on a "take it or leave it" basis. *See* Kennedy Decl. ¶¶ 3–4. Plaintiffs did not have an opportunity to negotiate its terms, and each Plaintiff was required to accept the Agreement in order to active his or her wireless service. *Id.* ¶¶ 3–5.

**[16]** This finding of procedural unconscionability alone is not enough, though, to deny a motion to compel arbitration. *Klink*, 2021 WL 3709167, at *10; *see also Lane v. Francis Capital Mgmt. LLC*, 224 Cal. App. 4th 676, 689, 168 Cal.Rptr.3d 800 (2014) ("[C]ourts have consistently held that [a contract of adhesion] alone is insufficient to invalidate an arbitration agreement: Rather, an adhesion contract remains fully enforceable unless ... the provision falls outside the reasonable expectations of the weaker party or it is unconscionable.") (internal quotation omitted); *see also O'Donoghue v. Superior Ct.*, 219 Cal. App. 4th 245, 258–59, 161 Cal.Rptr.3d 609 (2013) (finding that a declaration that "agreements were presented in 'take-it-or-leave-it manner' ... does not carry the day ... because the 'adhesive aspect' of a contract 'is not dispositive' on the issue of unconscionability").

As in *Lane* and *O'Donoghue*, the agreement here is a contract of adhesion, but the adhesive nature of the agreement presents only a minimal finding of procedural unconscionability.

#### 2. Substantive Unconscionability

**[17]** Since Plaintiffs have only established a minimal amount of procedural unconscionability, they must show significant substantive unfairness to avoid arbitration. *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 796, 137 Cal.Rptr.3d 773 (2012) ("Where ... the degree

of procedural unconscionability ... is low, [ ] the agreement will be enforceable unless the degree of substantive unconscionability is high."). Under California law, substantive unconscionability focuses on the terms of the agreement and whether those are "overly harsh" or "one-sided." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002); *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071, 130 Cal.Rptr.2d 892, 63 P.3d 979 (2003).

Here, Plaintiffs assert that six provisions of the Agreement are substantively unconscionable: (1) a 180-day contractual statute of limitations; (2) a pre-dispute jury waiver; (3) a punitive damages waiver; (4) a public injunctive relief waiver; (5) an exculpatory clause with unreasonable discovery limits; and (6) a mass arbitration provision. MTC Opp. at 11. Plaintiffs maintain that these unconscionable terms so permeate the agreement that they are non-severable and the entire agreement is unenforceable. *Id.* at 32–24. Verizon denies that any term is unconscionable, and contends that any terms the Court does deem unconscionable should be severed. Reply at 9–12.

**\*6** The Court examines each provision in turn.

a. 180-Day Contractual Statute of Limitations Provision

Plaintiffs first assert that the Agreement is substantively unconscionable because it contains a "180-day contractual statute of limitations for all disputes related to charges on a customer's bill." MTC Opp. at 11. Plaintiffs contend that this provision is substantively unconscionable because it "significantly shortens the limitations period on Plaintiffs' CLRA, FAL, and UCL claims, which range from 3 to 4 years." *Id.* The provision establishes that:

> If you're a Postpay customer, you can dispute your bill within 180 days of receiving it ... You may call us to dispute charges on your bill or any service(s) for which you were billed, but if you wish to preserve your right to bring an arbitration or small claims case regarding such dispute, you must write to us at the customer service address on your bill, or send us a completed notice of dispute form (available at verizon.com), within the

180-day period mentioned above. If you do not notify us in writing of such dispute within the 180-day period, you will have waived your right to dispute the bill or such service(s) and to bring an arbitration or small claims case regarding any such dispute.

Agreement at 4 (capitalization altered for clarity).

Verizon counters that the provision is not a statute of limitations because it merely requires customers to provide notice within a 180-day period. Reply at 5–6. Because "[p]roviding notice is not the same as commencing a lawsuit," the 180-day notice requirement "is not properly understood as a modification of the statute of limitations." *Id.* Verizon also points out that the Agreement separately addresses the applicable statute of limitations: the Agreement provides that "any applicable statute of limitations" are available as defenses in the arbitration. *Id.* at 6 n.3; Agreement at 6. And even if the provision *did* modify the statute of limitations, Verizon contends that would not necessarily be unconscionable. *Id.* at 6.

A provision which requires consumers to *notify* Verizon of a dispute within a set amount of time differs from a statute of limitations. There is a difference between having to notify a potential defendant of a claim and having to bring a lawsuit. The former is easier to accomplish. *Cf. Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1076 (9th Cir. 2007) ("The challenged provision covers more than merely 'notice'; it also requires a demand for mediation within a year ... the one-year notice provision thus functions as a statute of limitations.").

On the other hand, a customer who fails to notify Verizon within the 180-day notice window (because, *e.g.*, they are unaware of this contractual provision which has no precedent in the California Civil Code) will forfeit her right to bring suit. A short notice period (significantly shorter than the limitations period) sets a trap for the unwary. Functionally, this provision may well have the same effect as a statute of limitations in limiting the vindication of Plaintiffs' rights. *Cf.* administrative exhaustion requirements that effectively function as a limitations period such as Cal. Gov't Code §§ 911.2 (requiring a person to present his or her claim to the California Victim Compensation and Government Claims Board within six months of the accrual of the cause of action before filing certain actions for damages against a California

governmental entity or employee); 945.6(a)(1) (requiring that a claimant must file suit within six months following written notice of rejection of the claim by the Board.

 *7 **[18]**    **[19]** "Contractual agreements to shorten the statute of limitations period are generally disfavored because they derogate statutory intent." *Jackson v. S.A.W. Ent. Ltd.*, 629 F. Supp. 2d 1018, 1028 (N.D. Cal. 2009) (internal quotation omitted). "A contractual clause restricting the period in which an arbitration may be commenced is unconscionable where the period is 'far shorter' than that otherwise available under California law." *Brown v. Dow Chem. Co.*, No. 18-cv-07098-MMC, 2019 WL 484211, at *4 (N.D. Cal. Feb. 7, 2019) (quoting *Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249, 123 Cal.Rptr.3d 1 (2011)). Courts have found that a 180-day statute of limitations is unconscionable where it "significantly shortens" the limitations period for the plaintiff's claims. *Jackson*, 629 F. Supp. 2d at 1029 (finding six-month statute of limitations provision substantively unconscionable where plaintiff would otherwise have had three to four years to assert some of her claims); *Martinez v. Master Prot. Corp.*, 118 Cal. App. 4th 107, 114, 117–18, 12 Cal.Rptr.3d 663 (2004) (same). Here, like in *Jackson* and *Martinez*, the statute of limitations for Plaintiffs' claims ranges from three to four years. *See* Cal. Civ. Code § 1783 (3 years for CLRA), Cal. Civ. Proc. Code § 338(a) (3 years for FAL), Cal. Bus. & Prof. Code § 17208 (4 years for UCL).

 **[20]**   Although not quite as draconian as a limitation clause, the short notice provision here erects a potential trap to the unwary that may have the same effect as a short limitations period. The Court concludes that there is at least some degree of substantive unconscionability associated with the 180-day notice provision.

### b. Pre-Dispute Jury Trial Waiver Provision

Second, Plaintiffs argue that the pre-dispute jury trial waiver provision is substantively unconscionable. MTC Opp. at 13. The provision establishes that:

> If for any reason a claim proceeds in court rather than through arbitration, you and Verizon agree that there will not be a jury trial. You and Verizon unconditionally waive any right to trial

by jury in any action, proceeding or counterclaim arising out of or relating to this agreement in any way.

Agreement at 8 (capitalization altered for clarity).

 **[21]**   "Under California law, pre-dispute jury trial waivers are invalid unless expressly authorized by statute." *In re County of Orange*, 784 F.3d 520, 523 (9th Cir. 2015) (citing *Grafton Partners, L.P. v. Superior Ct.*, 36 Cal. 4th 944, 32 Cal.Rptr.3d 5, 116 P.3d 479 (2005)). Courts have held that an arbitration agreement is unenforceable where it "require[s] plaintiffs to waive in advance their right to a jury trial for any dispute for which arbitration is not allowed by law." *Dougherty v. Roseville Heritage Partners*, 47 Cal. App. 5th 93, 107, 260 Cal.Rptr.3d 580 (2020); *see also Lange v. Monster Energy Co.*, 46 Cal. App. 5th 436, 452, 260 Cal.Rptr.3d 35 (2020) (finding that pre-dispute jury trial waiver provision in arbitration agreement was substantively unconscionable); *Durruthy v. Charter Commc'ns, LLC*, No. 20-cv-1374, 2020 WL 6871048, at *12 (S.D. Cal. Nov. 23, 2020) (same).

Verizon cites *Grafton* for the principle that pre-dispute arbitration agreements are "specifically authorized by statute" and thus distinguishable from waivers of the right to jury trial. *Grafton*, 36 Cal. 4th at 955, 32 Cal.Rptr.3d 5, 116 P.3d 479. But that is not the issue here. While a jury trial waiver is inherent in arbitration agreements, Plaintiffs take issue with the jury trial waiver preceded by the words "if for any reason a claim proceeds in court rather than through arbitration." *That* jury trial waiver "is not susceptible to any interpretation *other* than as an unconscionable predispute jury trial waiver." *Lange*, 46 Cal. App. 5th at 452, 260 Cal.Rptr.3d 35 (emphasis in original) (citing *Grafton*, 36 Cal. 4th at 961, 32 Cal.Rptr.3d 5, 116 P.3d 479).

While the Court concludes that the pre-dispute jury trial waiver is unenforceable and substantively unconscionable, this provision only applies to claims that proceed outside of arbitration. *See* Agreement at 8 ("If for any reason a claim proceeds in court rather than through arbitration, you and Verizon agree that there will not be a jury trial."). In other words, by its express terms, the provision is triggered when a claim is *not* being arbitrated. *Id.* Thus, because the jury trial waiver does not "limit the scope of the arbitration," the Court puts no weight on this provision in assessing the substantive unconscionability of the arbitration clause. *Newton*, 854 F. Supp. 2d at 726.

### c. Punitive Damages Waiver Provision

**\*8**  Third, Plaintiffs argue that the punitive damages waiver is substantively unconscionable because it prohibits punitive damages, which are available under the CLRA. MTC Opp. at 13–14; Cal. Civ. Code § 1780(a)(4). Plaintiffs have not actually sought punitive damages in the FAC but seek leave to do so.[1] The relevant provision establishes that:

> You and Verizon both agree to limit claims against each other solely to direct damages. That means neither of us will claim any damages that are indirect, special, consequential, incidental, treble or punitive.

Agreement at 5. Verizon does not address Plaintiffs' arguments regarding this provision.

[1]  Plaintiffs explained that they inadvertently omitted a specific prayer for punitive damages in the First Amended Complaint. They request leave to amend solely to add the prayer for punitive damages. *See* MTC Opp. at 14 n.15.

**[22]**  California courts have found substantive unconscionability where an arbitration clause limits the types of remedies that would be available under the statute, thus violating the "principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees." *Newton*, 854 F. Supp. 2d at 724 (quoting *Armendariz*, 24 Cal. 4th at 103, 99 Cal.Rptr.2d 745, 6 P.3d 669); *see also Zaborowski v. MHN Gov't Servs., Inc.*, 936 F. Supp. 2d 1145, 1155 (N.D. Cal. 2013), *aff'd*, 601 F. App'x 461, 463 (9th Cir. 2014) ("California courts have repeatedly refused to enforce contractual limitations on statutorily imposed remedies such as punitive damages as unconscionable, based primarily on the rationale that the remedies are important to the effectuation of that statute's policy.") (internal quotation omitted). Because the limitation of liability clause prevents Plaintiffs from receiving damages that they are entitled to under CLRA, this term is substantively unconscionable. *Newton*, 854 F. Supp. 2d at 725; *Dougherty*, 47 Cal. App. 5th at 107, 260 Cal.Rptr.3d 580. As noted above,

although this limitation is located outside the arbitration clause, it is intertwined with and enforced via arbitration.

The Court concludes that this provision is substantively unconscionable.

### d. Public Injunctive Relief Waiver Provision

Fourth, Plaintiffs argue that the public injunctive relief waiver provision is substantively unconscionable. MTC Opp. at 14–15. The provision establishes that:

> Notwithstanding any other provision of this agreement, the arbitrator may award money or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

Agreement at 6 (capitalization altered for clarity).

**[23]**  Under California law, a contractual provision purporting to waive the right to seek public injunctive relief in any forum is unenforceable. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 952, 216 Cal.Rptr.3d 627, 393 P.3d 85 (2017). Verizon's agreement limits the award of any injunctive relief to "the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." Agreement at 6. By precluding injunctive relief benefitting anyone other than the individual claimant, the contract prevents Plaintiffs from seeking public injunctive relief in any forum, a right which cannot be denied whether in arbitration or otherwise. Therefore, if Plaintiffs' requested relief qualifies as public injunctive relief, Verizon may not negate that claim. *McGill*, 2 Cal. 5th at 952, 216 Cal.Rptr.3d 627, 393 P.3d 85.

**\*9**  **[24]**  Verizon contends that Plaintiffs are not seeking "true public relief" within the meaning of *McGill*. Reply at 8–9. Verizon is mistaken. "[T]o qualify as public injunctive relief, an injunction must be 'for the benefit of the general public as a whole, as opposed to a particular class of persons.' " *Cottrell v. AT&T Inc.*, No. 20-cv-16162, 2021 WL 4963246 (9th Cir. Oct. 26, 2021) (quoting *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021)). "[T]he

statutory schemes set out in 'the UCL, the CLRA, and the false advertising law' are explicitly designed to provide for 'public injunctive relief' that is '[b]y definition' 'primarily for the benefit of the general public.' " *Vasquez v. Cebridge Telecom CA, LLC*, 569 F.Supp.3d 1016, 1026 (N.D. Cal. 2021) (quoting *McGill*, 2 Cal. 5th at 961, 216 Cal.Rptr.3d 627, 393 P.3d 85). Indeed, in *Hodges*, the Ninth Circuit observed that "[t]he paradigmatic example [of public injunctive relief] would be the sort of injunctive relief sought in *McGill* itself, where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan." 21 F.4th at 542.

 **[25]** Here, the FAC seeks this "paradigmatic example" of public injunctive relief: to enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public via public injunctions under the UCL, FAL, and CLRA—the very same statutes and type of relief at issue in *McGill*. *See, e.g.*, FAC ¶ 12 ("Plaintiffs, by this action, seek a public injunction for the benefit of the general public to ... enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public"); ¶ 14 ("Plaintiffs want Verizon to include the amount of the Administrative Charge in the wireless service plan prices it advertises to the general public"); ¶ 512 ("Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public"); Prayer § A(1)–(3) ("In order to prevent injury to the general public, Plaintiffs individually, and as private attorneys general, request that the Court enter a public injunction against Verizon under the CLRA, FAL, and UCL ... [to] [p]ermanently enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public"). Verizon is thus incorrect that Plaintiffs' "claims and requested remedy only pertain to the limited universe of customers who have specific contracts with Verizon." MTC at 10.

Verizon also complains that Plaintiffs have "only conclusorily allege[d] their right to such a remedy." MTC at 10. In *McGill* itself, however, the California Supreme Court found sufficient allegations of false advertising less detailed than those here— for example, that the defendant " 'continue[s] to violate' the UCL by selling the Plan 'with advertising that includes false, misleading or deceptive information.' "

During the hearing, Verizon argued that the Supreme Court's impending decision in *Viking River Cruises, Inc. v. Moriana*

may implicate and undermine *McGill*. After the decision was handed down, the Court allowed the parties to submit supplemental briefing to address the applicability of *Viking River*. Docket Nos. 50–52. After carefully considering the parties' arguments, the Court agrees with Plaintiffs that *Viking River* does not undermine *McGill* or otherwise bear on the present case. *Viking River* focused on a procedural mechanism particular to California's Labor Code Private Attorneys General Act of 2004 ("PAGA"), which allows any "aggrieved employee" to initiate an action against a former employer to obtain civil penalties that previously could have been recovered only by the State. *Viking River*, 142 S.Ct. at 1910 (quoting Cal. Lab. Code Ann. § 2699(a)). *Viking River* held that the FAA preempts a rule of California law that PAGA claims could not be split into arbitrable "individual" claims, which are based on a violation personally experienced by the plaintiff, and nonarbitrable "representative" claims, which are brought on behalf of violations experienced by other employees. *Id.* at 1924. Importantly, *Viking River* found that the FAA does *not* preempt a rule of California law prohibiting wholesale waivers of the right to assert representative claims under PAGA. *Id.* at 1924–25. Thus nothing in *Viking River* overrules or undermines *McGill*'s core holding that an arbitration agreement cannot prohibit a party from seeking public injunctive relief in any forum.

 **\*10** Under *McGill*, this provision of the arbitration agreement is unenforceable.


### e. Exculpatory Clause and Its Discovery Limitations Provision

Fifth, Plaintiffs argue that the purported "exculpatory clause" and "its discovery limitation" are substantively unconscionable. MTC Opp. at 16–17. The provision provides that:

> This agreement and the documents it incorporates form the entire agreement between us. You can't rely on any other documents, or on what's said by any Sales or Customer Service Representatives, and you have no other rights regarding Service or this agreement.

Agreement at 8.

The parties have very different understandings of the meaning of this provision. From Plaintiffs' perspective, the provision "purports to exculpate Verizon from the misleading misrepresentations made in its advertisements or by its sales and customer service representatives." MTC Opp. at 16. *Any* reliance on such evidence would be barred. Plaintiffs further argue that the provision "unconscionably limits a consumer's right to adequate discovery in arbitration by commanding that a consumer 'cannot rely' upon (and therefore cannot discover) the very documents and statements that formed the basis of the false advertising or fraud." *Id.* Verizon, on the other hand, characterizes this provision as a "routine integration clause." Reply at 8.

 [26]   The problem with Verizon's theory is that this provision appears to sweep broader than a common integration clause —it purports to exclude *all* extrinsic evidence without *any* exceptions, even to claims for which extrinsic or parol evidence may be considered. For instance, "[e]vidence extrinsic to the contract is always permissible to prove fraud in the inducement of the contract pursuant to both common and statutory law." *625 3rd St. Assocs., L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1051 (N.D. Cal. 2009); *see also In re Lund*, 357 F. App'x 139, 141 (9th Cir. 2009) (noting that "the parol evidence rule does not bar introduction of extrinsic evidence to show fraudulent inducement"); *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1180–81, 151 Cal.Rptr.3d 93, 291 P.3d 316 (2013) ("[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud.") (quoting *Ferguson v. Koch*, 204 Cal. 342, 345, 268 P. 342 (1928)). The exculpatory claims here thus may function to negate substantive legal rights and remedies of Verizon consumers.

Verizon contends that Plaintiffs' arguments are not applicable because "Plaintiffs have not even asserted a fraud claim." Reply at 8. But Plaintiffs have alleged that Verizon has violated the UCL by engaging in "unfair and fraudulent business acts and practices," including by, among other things, "[m]isrepresenting the prices of Verizon's wireless service plans and concealing the true prices of its wireless service plans," "[m]isrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge," and "[f]ailing to disclose the existence or amount of the Administrative Charge when consumers sign up for Verizon's

wireless service plans." FAC ¶¶ 554(a)–(c). These allegations may imply fraud in the inducement.

 **\*11**   **[27]**   The Court concludes that because the provision does not allow for extrinsic evidence to be considered under any circumstances, including to show fraud, this provision is substantively unconscionable.

### f. Mass Arbitration Provision

Finally, Plaintiffs argue that the mass arbitration provision is substantively unconscionable. MTC Opp. at 17–23. The provision establishes that:

> If 25 or more customers initiate notices of dispute with Verizon Wireless raising similar claims, and counsel for the Verizon Wireless customers bringing the claims are the same or coordinated for these customers, the claims shall proceed in arbitration in a coordinated proceeding. Counsel for the Verizon Wireless customers and counsel for Verizon Wireless shall each select five cases to proceed first in arbitration in a bellwether proceeding. The remaining cases shall not be filed in arbitration until the first ten have been resolved. If the parties are unable to resolve the remaining cases after the conclusion of the bellwether proceeding, each side may select another five cases to proceed to arbitration for a second bellwether proceeding. This process may continue until the parties are able to resolve all of the claims, either through settlement or arbitration. A court will have authority to enforce this clause and, if necessary, to enjoin the mass filing of arbitration demands against Verizon.

Agreement at 7 (capitalization altered for clarity).

In other words, the mass arbitration provision, which is triggered when 25 or more customers who are represented by the same counsel raise "similar claims," sets a cap on the number of arbitrations against Verizon that may proceed at one time. *Id.* It also functions to delay arbitration of cases until each preceding tranche of 10 cases is adjudicated. Counsel for plaintiffs and counsel for Verizon each select five cases; all remaining cases "shall not be filed in arbitration" until the first ten have been resolved. *Id.* Once the first ten have been resolved, then the additional cases with "similar claims" and the same plaintiffs' counsel are arbitrated in batches of ten. *Id.* Plaintiffs' counsel currently represent 2,712 Verizon customers. *See* Docket No. 30 (Declaration of Daniel M. Hattis, or "Hattis Decl.") ¶ 3. The provision specifically requires that only ten cases may be arbitrated at one time and that the remaining cases "*shall not* be filed in arbitration until the first ten have been resolved." Agreement at 7 (emphasis added). According to statistics from the American Arbitration Association showing that the average disposition time for an arbitration takes a little under seven months, Plaintiffs calculate that it would take approximately 156 years to resolve the claims of all of Plaintiffs' counsel's clients. MTC Opp. at 17–18 & 18 n.17.

Plaintiffs argue that this provision "contains all of the hallmarks of unconscionability: it is overly harsh, unduly oppressive, and unfairly one-sided; it lacks mutuality; it would deter potential litigants from enforcing their rights, it contravenes public policy, and it interferes with consumers' constitutional right to their choice of counsel." *Id.* at 17. Verizon characterizes Plaintiffs' arguments as "speculative distractions." Reply at 12. According to Verizon, the "27 Plaintiffs in the instant case could have their claims resolved in three concurrent proceedings—a far cry from the 156 years speculated by Plaintiffs." *Id.* at 13. Verizon maintains that its "coordinated proceeding approach" is "designed precisely to expedite resolution of similar cases." *Id.*

**\*12**  **[28]**  Verizon also insists that the unconscionability analysis must be limited to the twenty-seven Plaintiffs in this case without regard to the other 2,685 customers of Verizon that are clients of Plaintiffs' law firm. *See* Reply at 1 ("Plaintiffs further ask this Court to look beyond their suit and to consider thousands of unnamed Verizon Wireless customers purportedly also retained by Plaintiffs' counsel but who have yet to file any action in this Court or elsewhere."). According to Verizon, "[t]heoretical issues facing individuals not before this Court cannot serve as the basis for an unconscionability challenge." *Id.*; *see also id.*

at 13 ("Plaintiffs [*sic*] arguments rely almost entirely on delay that would theoretically be experienced by 2,712 [2] individuals who are not before this Court."). On this point, Verizon is wrong. In assessing unconscionability, the Court must examine the validity of a contractual provision as of the time of the contract is made – it is a prospective analysis which does not require proof that a particular plaintiff has already been adversely affected. *See, e.g., Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 875 (9th Cir. 1979) ("[W]hether a contract is fair or works an unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight."); *Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167, 1173 (C.D. Cal. 1997), *aff'd*, 211 F.3d 1276 (9th Cir. 2000) ("An unconscionability claim accrues at the moment when the allegedly unconscionable contract is formed ... [the] unconscionability of a contract or a contract clause is determined based on the law and facts at the time of the agreement.").

2     For clarity, the Court notes that according to the Hattis Declaration, Hattis & Lukacs have been retained by 2,712 separate clients from around the country who each have false advertising claims against Verizon that are similar to the claims alleged in the present suit. Hattis Decl. ¶ 3. Twenty-seven of these clients are the Plaintiffs in this action. *Id.* There are thus 2,685 customers of Verizon who are not currently Plaintiffs before the Court.

Moreover, the California Supreme Court in *Armendariz* considered the potential chilling effect that an arbitration clause would exert on employees seeking to file workplace discrimination claims. *See Armendariz*, 24 Cal. 4th at 110, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("Such a system still poses a significant risk that employees will have to bear large costs to vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right."). In the wake of *Armendariz*, courts routinely consider the chilling effect on non-parties who may yet seek to vindicate their rights. *See, e.g., Pereyra v. Guaranteed Rate, Inc.*, No. 18-cv-06669-EMC, 2019 WL 2716519, at \*8 (N.D. Cal. June 28, 2019) (finding substantive unconscionability where "[t]he existence of the fee provision may well have a chilling effect on employees seeking to vindicate their rights"); *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1188 (N.D. Cal. 2020) ("This provision undermines the balance of the risk of fee shifting

prescribed by statute and can have a substantial chilling effect on plaintiffs seeking to vindicate their rights. This provision is substantively unconscionable."); *Martinez*, 118 Cal. App. 4th at 118, 12 Cal.Rptr.3d 663 (rejecting provision because "[t]he mere inclusion of the costs provision in the arbitration agreement produces an unacceptable chilling effect"); *cf. Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015), *aff'd*, 699 F. App'x 620 (9th Cir. 2017) (rejecting company's offer to waive unconscionable provisions in arbitration agreement and noting that "the mere inclusion of these unconscionable provisions has an improper chilling effect"). Taken collectively, these cases indicate that courts may consider the chilling effect of an arbitration clause on individuals to whom it would apply but are not currently plaintiffs. As a result, the Court will consider the unconscionability of the mass arbitration provision with regard to both the twenty-seven Plaintiffs and the 2,685 other individuals who are represented by Plaintiffs' firm.

[29]  The Court agrees with Plaintiffs that this provision is substantively unconscionable.

Requiring the consumers who retain counsel willing to represent them in cases such as this to wait months, more likely years before they can even submit a demand for arbitration is "unreasonably favorable" to Verizon. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017). Delaying the ability of one to vindicate a legal claim by years, possibly *156 years*, "conflict[s] with one of the basic principles of our legal system—justice delayed is justice denied." *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021). Terms that "contravene the public interest or public policy" are substantively unconscionable. *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244, 200 Cal.Rptr.3d 7, 367 P.3d 6 (2016).

*13  In addition to the length of delay, the provision is pregnant with the risk that claims will be effectively barred when coupled with the statute of limitations. The Agreement expressly reserves Verizon's right to raise a statute of limitations defense in arbitration. *See* Opp. at 18; Agreement at 6 ("The same defenses are also available to both parties as would be available in court, including any applicable statute of limitations."). Under the Mass Arbitration Provision, consumers may not "file" their claims in arbitration until all preceding traunches are adjudicated. Those in the queue who are not able to file within the limitations period would be forever barred. The clause contains no tolling provision. The forfeiture of entire legal rights contravenes public policy.

*See Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009) (noting that "California public policy is violated by forcing such plaintiffs to waive their rights to a class action and remedies under California consumer law"); *Kooiman v. Siwell, Inc.*, No. 20-cv-00565, 2021 WL 899095, at *5 (C.D. Cal. Jan. 4, 2021) (refusing to enforce a forum selection clause which "violates public policy by "allowing unwaivable rights to be diminished").

[30]  After the hearing, Verizon sought leave to notify the Court of upcoming changes to the Agreement. *See* Docket No. 43, Docket No. 44. According to these filings, Verizon plans to update the Agreement "in or around August 2022" to "expressly provide that, upon initiating a notice of dispute or filing a complaint in court, the statutes of limitations applicable to a customer's dispute are tolled until the completion of the coordinated arbitration proceeding described in Paragraph (6)." Docket No. 44 at 2. In response, Plaintiffs pointed out that the Agreement precludes Verizon from changing the terms of dispute resolution proceedings once a dispute is pending. *See* Docket 46 at 3. Plaintiffs are correct: the Agreement specifically provides that "if [Verizon] make[s] any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change." Agreement at 2. As a result, Verizon's efforts to cure the statute of limitations problem for the Plaintiffs herein are unavailing. And in any event, the contemplated changes are not in effect.

The provision also lacks mutuality, which is a "paramount" consideration in assessing substantive unconscionability. *Pokorny*, 601 F.3d at 997 (internal quotation omitted). Although the provision imposes restrictions on a law firm representing twenty-five or more of Verizon's customers with "similar claims," Verizon is apparently free to select the same law firm to represent it in all of its arbitrations. *See* Agreement at 6. Verizon is thus able to enjoy all of the advantages that come from being a "repeat player," while law firms that represent twenty-five or more of Verizon's customers may be forced to sideline any clients which would exceed the numeric cap.

This case stands in stark contrast to *McGrath v. DoorDash*, where this Court examined the validity of a mass arbitration provision modeled off of the Employment-Related Mass Claims Protocol of the International Institute for Conflict Prevention & Resolution.[3]  *McGrath v. DoorDash, Inc.*, No. 19-cv-05279-EMC, 2020 WL 6526129, at *4 (N.D. Cal. Nov. 5, 2020). Like with the present provision, DoorDash's

"Mass-Claims Protocol" applied any time more than a certain number of individual employment-related arbitration claims "of a nearly identical nature" were filed against DoorDash in "close proximity" to one another. *Id.* But the similarities ended there. Under the Protocol, claims were randomly assigned numbers. *Id.* The Protocol provided that the claims numbered 1-10 would, in general, be the "initial Test Cases" to proceed to arbitration. *Id.* Importantly, the Protocol generally required that "these claims will be resolved within 120 days of the initial pre-hearing conference." *Id.* "Thereafter, the results of the initial cases are given to a mediator who will try to resolve the remaining cases. After a mediation period of 90 days, the parties may choose to opt out of the arbitration process and proceed in court with the remaining claims." *Id.* (internal quotation omitted).

3       The International Institute for Conflict Prevention & Resolution, or CPR, is a 501(c)(3) not-for-profit organization formed in 1977. *McGrath*, 2020 WL 6526129, at *4 n.5.

 **\*14** Because the DoorDash arbitration agreement contained a delegation clause, the Court's role was limited to evaluating whether the Protocol was "so biased that it negates the agreement to arbitrate." *Id.* at \*11. In explaining why the terms of the Mass-Claims Protocol "appear fair," the Court noted that there was "little concrete evidence to support Plaintiffs' argument that the Mass-Claims Protocol would result in significant delay in resolution of the Dashers' claims." *Id.* at \*10. And the Court observed that "[m]ost important, after the mediation process, a claimant can choose to opt out of the arbitration process and go back to court – an option not generally available under, *e.g.*, AAA rules." *Id.* at \*10. In short, the DoorDash Mass-Claims Protocol did not create the possibility of significant delay that is facially present here.

This provision at issue herein also stands in stark contrast to the American Arbitration Association's ("AAA") Supplementary Rules for Multiple Case Filings, which the AAA developed last year to "provide parties and their representatives with an efficient and economical path toward the resolution of multiple individual disputes." *See* Am. Arbitration Ass'n, *Supplementary Rules for Multiple Case Filings* 3 (Aug. 1, 2021). The Supplementary Rules apply where 25 or more similar demands for arbitration are filed against or on behalf of the same party or related parties, and where representation of the parties is consistent or coordinated across the cases. *Id.* at 4. The Supplementary Rules *do not* require that a party wait a set amount of

time before initiating a demand for arbitration. Nor do they require that arbitrations proceed in tranches. And while the Supplementary Rules provide that the parties shall participate in a global mediation within a set amount of time, "any party may unilaterally opt out of mediation upon written notification to the AAA and the other parties to the arbitration." *Id.* at 8–9. The Rules also make clear that the global mediation shall take place currently with the arbitrations and "shall not act as a stay of the arbitration proceedings." *Id.* at 8. Verizon's mass arbitration provision thus has little in common with the Supplementary Rules. It is one thing to set up a bellwether system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution via ADR. It is another to formally bar the timely adjudication of cases that do not settle.

For all of the foregoing reasons, the Court concludes that the provision is substantively unconscionable.

### 3. Severability

Because the Court finds that both procedural and substantive unconscionability are present, the Court must analyze whether the unconscionable parts of the arbitration provision should be severed or whether it should refuse to enforce the arbitration agreement altogether because unconscionability permeates the entire agreement.

 **[31]**  "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). The Court has the discretion to sever or limit unconscionable clauses. *See id.*; *see also Poublon*, 846 F.3d at 1272.

In making this decision, the Court will look to the purpose of the contract. "If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." *Armendariz*, 24 Cal. 4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669. In particular, when an arbitration clause is "permeated" by unconscionability, severance is not required. *Id.*

**\*15**  **[32]**  The California Supreme Court in *Armendariz* weighed three factors in determining whether severance is appropriate: (1) whether the substantively unconscionable provision relates to the arbitration agreement's chief objective; (2) whether the arbitration agreement contained multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum; and (3) a lack of mutuality that permeated the entire agreement. 24 Cal. 4th at 124–25, 99 Cal.Rptr.2d 745, 6 P.3d 669, *see also Poublon*, 846 F. 3d at 1272 (severance is determined by examining the unconscionable provisions in relation to the purpose of the contract).

### a. Severability Clauses in the Agreement

The Agreement has two provisions which bear on severability. First, the arbitration clause has a severability provision, which reads:

> If for some reason the prohibition on class arbitrations set forth in subsection (3) cannot be enforced as to all or part of a dispute, then the agreement to arbitrate will not apply to that dispute or part of the dispute.

Agreement at 7 (capitalization altered for clarity). Subsection three, in turn, precludes claims for class, representative or private attorney general, or general injunctive relief. *Id.* at 6. The Agreement also has a second severability provision, which reads:

> If any part of this agreement, including anything regarding the arbitration process (except for the prohibition on class arbitrations as explained in part 8 of the dispute resolution section above), is ruled invalid, that part may be removed from this agreement.

Agreement at 8.

**[33]**  "Severability clauses evidence the parties' intent that, to the extent possible, the valid provisions of the contracts be given effect, even if some provision is found to be invalid or unlawful." *Pereyra*, 2019 WL 2716519, at \*10 (quoting *Baeza v. Superior Ct.*, 201 Cal. App. 4th 1214, 135 Cal.Rptr.3d 557 (2011)).

However, as explained below, the severance clauses are not dispositive in this case.

### b. Severance Is Not Appropriate Because the Agreement Is Permeated by Unconscionability

**[34]**  The existence of the severability clauses does not change the fact that where an agreement is permeated by unconscionability, a court will not sever the unlawful provisions. *See Jackson*, 629 F. Supp. 2d at 1030 (refusing to apply severability clause to save an agreement permeated by unconscionability); *Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 183–84, 185 Cal.Rptr.3d 151 (2015) ("[A] court should sever an unconscionable provision unless the agreement is so 'permeated' by unconscionability that it cannot be cured by severance."). As a result, the critical question for the Court is whether the Agreement is so permeated by unconscionability that it warrants departing from the generalized severance clause, which instructs that should "any part" of the Agreement be "ruled invalid," then "that part may be removed" from the Agreement. Agreement at 8.

**[35]**  Verizon is correct that, as a mechanical matter, the problematic provisions could be excised from the Agreement, leaving enough of the arbitration and arbitration-related provisions for the Court to enforce and without requiring the Court to reform the agreement. *See Armendariz*, 24 Cal. 4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669. "But the fact that a severance can mechanically and grammatically be accomplished is not dispositive." *Jackson*, 629 F. Supp. 2d at 1030. As noted above, the California Supreme Court in *Armendariz* was also concerned with whether there was something in the arbitration agreement—such as the fact of more than one unlawful provision—which suggested that the party in the superior bargaining position was trying to impose arbitration not as an alternative to litigation but rather as an inferior forum.

**\*16**  **[36]**  Here, there is strong evidence that Verizon was trying to impose an "inferior forum" on its customers. First,

the notice period creates a narrow six-month window in which Verizon's customers must notify Verizon of the dispute or otherwise waive their claims. Though different from a statute of limitations, as explained above, it may have the same operative effect as a practical matter. Second, the limitations of liability provision prevents Plaintiffs from recovering any punitive damages, therefore negating a statutory right to a remedy. Third, the public injunctive relief waiver prevents Plaintiffs from raising important claims currently protected by statute. Fourth, the exculpatory provision prevents Plaintiffs from relying on information provided to them by, *e.g.*, Verizon's customer service representatives even for claims such as fraud in the inducement for which an exception to the parol evidence rule has long existed. Finally, the mass arbitration provision means that many of Verizon customers will not be able to file a claim in arbitration for years and possibly ever. It can operate to effectively thwart arbitration and vindication of rights altogether. In sum, the arbitration clause and the applicable limitations as a whole demonstrate a systematic effort to impose arbitration on a customer as an inferior forum. *Newton*, 854 F. Supp. 2d at 729. The Court reaches this conclusion based on the number of unconscionable provisions, their nature, and the overall effect which is entirely foreseeable and intended. It appears to the Court that the object of the Agreement is to force Verizon consumers into an inferior (and, in many circumstances, wholly ineffective) forum.

The Court further notes that permitting the Agreement to stand because Verizon proposes to sever any unconscionable provisions creates a "perverse incentive." *See Capili*, 116 F. Supp. 3d at 1009. If the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court. *Id.*; *cf. Kooiman v. Siwell, Inc.*, No. 20-cv-00565, 2021 WL 899095, at *5 (C.D. Cal. Jan. 4, 2021) ("Unfortunately, the drafters of such unenforceable provisions are often rewarded because of the chilling effect they have; a California employee is likely to believe the contractual provision to be binding and may therefore simply forego pursuit of her statutory rights ..."); *Armendariz*, 24 Cal. 4th at 110, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("Such a system still poses a significant risk that employees will have to bear large costs to vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right."). The remedy of severance, therefore, may indirectly reward systemic unconscionability. The remedy of severance deserves close consideration and scrutiny.

The Court concludes that severance of the unconscionable provisions is not appropriate and, therefore, **DENIES** Verizon's motion to compel arbitration. Verizon's request to stay proceedings is **DENIED** as moot.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Verizon's motion to compel arbitration. Verizon's request for leave to file notification of change to the Customer Agreement is **DENIED** as moot.

This order disposes of Docket Nos. 20 and 43.

**IT IS SO ORDERED.**

## All Citations

--- F.Supp.3d ----, 2022 WL 2390997

---

End of Document
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Individual Claimants, )<br><br>        Claimants, )<br> )<br>vs. )<br> )<br>Cellco Partnership dba Verizon Wireless & )<br>Verizon )<br> )<br>        Respondent. )<br> )<br> )<br> )<br> )<br> ) | No. 01-22-0003-9225<br><br>**ORDER** |

Two issues are presented in this arbitration:[1]

> Whether as a Process Arbitrator I have authority to determine if the Verizon Mass Arbitration Agreement complies with the Consumer Due Process Protocol

> Whether the Verizon Mass Arbitration Agreement complies with the Consumer Due Process Protocol

A hearing was held on these issues on January 26, 2023, at which time both parties presented their argument through their respective counsel: Hattis & Lukacs and DeNittis Osefchen Prince, P.C. for Claimants; and Hunton Andrews Kurth LLP for Respondent Cellco Partnership ("Verizon").   I have considered the oral arguments and the parties' excellent written submissions.

This case involves the interplay between the American Arbitration

---

[1]This statement of the issues was agreed to by the parties.

1

Association (the "Association") Consumer Arbitration Rules (the "Consumer Rules"), the Association's recently adopted Supplementary Rules for Multiple Case Filings (the "Supplementary Rules"), and the Consumer Due Process Protocol Statement of Principles (the "Protocol").   The Protocol, which lists fifteen principles, is the result of deliberations of the Association's National Consumer Disputes Advisory Committee whose purpose was to propose guidelines to enable parties to have a "fundamentally-fair ADR process."

### Background

The Association will administer consumer arbitrations only if they comply with the Protocol. Consumer Rules R-1(d).  Cell phone contracts fall within the scope of the Consumer Rules.   R-1(a).  The Association maintains a Consumer Clause Registry of arbitration agreements which it finds "materially and substantially" comply with the Protocol.  The Verizon Mass Arbitration Provision, attached to this Order, was placed on the registry after the Association found it materially and substantially complied with the Protocol.   After Verizon registered the Mass Arbitration Provision in 2021, the Association notified Verizon it was prepared to administer arbitrations pursuant to its terms.   The determination was described as an "administrative review."   In 2022,[2] Verizon submitted a modified version of the Mass Arbitration Provision, and, once again, the Association determined it would administer arbitrations pursuant to that agreement as it again found the Mass Arbitration Provision materially and substantially complied with

---

[2] All dates hereafter occurred in 2022.

2

the Protocol.

In March, Claimants' counsel wrote to the Association questioning whether the Mass Arbitration Provision did, in fact, "substantially and materially" comply with the Protocol. The Association responded on March 25, noting the "concerns" and further explaining that in accordance with the Supplementary Rules, a "Process Arbitrator can be appointed to determine initial administrative issues such as the AAA's administrative determination involving the Due Process Protocols." On June 2, counsel for Claimants filed 2536[3] individual consumer arbitrations against Verizon. On June 29, the Association, although acknowledging it could administer all of the arbitrations "at this time," explained it was bound to follow the Mass Arbitration Provision "that limits 10 cases to proceed at a time." In response to an email from Claimants' counsel stating his opinion the Mass Arbitration Provision did not comply with the Protocol and requesting appointment of a Process Arbitrator, on November 11 the Association appointed the undersigned in that capacity.

### The Verizon Mass Arbitration Provision

The following are some of the provisions of the Mass Arbitration Provision relevant to the issues in this proceeding:

- It prohibits class or collective arbitrations
- Sixty days' notice must be given to Verizon if a consumer wishes to initiate arbitration
- If 25 or more customers initiate notices of a dispute raising similar claims, the arbitrations shall proceed in a

---

[3] Twenty-eight claims were subsequently withdrawn.

"coordinated" fashion

- Counsel for the customers and counsel for Verizon shall each select five cases to proceed in a "bellwether" proceeding; the cases are to be arbitrated individually
- The remaining cases shall not be filed in arbitration until the first ten arbitrations have been concluded
- If the remaining cases are not resolved based on the outcome of the bellwether proceedings, ten more cases will be selected, and so on, until all cases have been submitted for arbitration, ten at a time

## Contentions of the Parties

Because the determination that the Mass Arbitration Provision complies with the Protocol is described by the Association as an administrative decision, Claimants contend a Process Arbitrator is empowered to revisit that determination and to further rule on the Process Arbitrator's jurisdiction.  Claimants also contend the Mass Arbitration Provision does not substantially and materially comply with the Protocol in three respects, but particularly with respect to Principle 8, "Reasonable Time Limits."  It provides in part that "ADR proceedings should occur within a reasonable time, without undue delay."

Verizon, not surprisingly, disagrees. It points out that on two occasions the Association found the Mass Arbitration Provision complies with the Protocol, and that determination should not be set aside absent a showing of clear error.[4]  The key argument made by Verizon, however, is that the practical consequence of a determination the Mass Arbitration Provision does not comply with the Protocol will be to remove this case from arbitration and into court.  This, says Verizon, is a

---

[4] Nothing in the Supplementary Rules suggests a Process Arbitrator is expected to defer to, or rubber stamp, the Association's administrative decisions.

4

decision regarding arbitrability, which cannot be made by a Process Arbitrator and can only be made by a Merits Arbitrator.

**Discussion**

<u>A Process Arbitrator Has Authority to Determine Whether the Mass Arbitration Provision Complies with the Protocol</u>

Although Verizon is correct the Association has twice determined the Mass Arbitration Provision complies with the Protocol, the Association was quite clear in its approval that it was making an administrative determination. For example, the Association's letter to counsel for the parties on June 29 explains the Association's review "is only an administrative determination by the AAA." Once again, in a letter to Verizon on October 13, the Association explained that its "review of the arbitration clause is only an administrative review."

Because Claimants' counsel disagreed with the determination by the Association that the Mass Arbitration Provision complied with the Protocol, that triggered Supplementary Rule MC-6(a).  That Rule allows any party to disagree with the Association's initial determination of any administrative issue.  In response to the objection from Claimants, the Association appointed the undersigned as the Process Arbitrator whose authority includes "the power to rule on the Process Arbitrator's own jurisdiction and . . . resolve any disputes over the applicability" of Rule MC-6. Supplementary Rule MC-6(f).  The Association twice explained the question of whether the Mass Arbitration Provision complies with the Protocol is an administrative issue.  Because administrative issues under the Supplementary Rules may be resolved conclusively and finally by a Process

1   Arbitrator, I conclude I "have the power" to rule on whether the Mass Arbitration

2   Provision complies with the Protocol.

3       Verizon disagrees that a determination by the Association that its Mass

4   Arbitration Provision does not comply with the Protocol is merely an

5   "administrative" decision.  If it is determined the Mass Arbitration Provision does

6   not comply with the Protocol, "either party may choose to submit its dispute to the

7   appropriate court for resolution."  Consumer Rule R-1(d).  Thus, Verizon explains

8   that such a determination could render the Claimants' disputes not subject to

9   arbitration which Verizon describes as a ruling on arbitrability.  Verizon contends

10  such a determination can only be made by a Merits Arbitrator.[5]    According to

11  Verizon, the question of arbitrability goes to the merits of the Claimants' claims

12  and is not an administrative issue at all.

13      On this point, Verizon is mistaken—determining whether a dispute is

14  arbitrable is not the same question as determining the merits of the dispute.  That

15  distinction was made clear over 25 years ago in *First Options of Chicago, Inc. v.*

16  *Kaplan*, 514 U.S. 938, 942 (1995).  *E.g., ConocoPhillips, Inc. v. Local 13-0555*

17  *United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014) (citing *First*

18  *Options* for the principle that determining arbitrability is different than

19  determining the merits of a dispute); *Heights at Issaquah Ridge, Owners Ass'n v.*

---

[5] Verizon is correct that Consumer Rule R-14 provides that an "arbitrator shall have the power to rule on . . . the arbitrability of any claim."  But nothing about that Rule attempts to distinguish between the role of a Merits Arbitrator or Process Arbitrator as described in the Supplementary Rules.  Although a determination that an arbitration agreement does not comply with the Protocol **may** allow the parties to submit their dispute to court, that is a far cry from a "ruling" on the arbitrability of the claim.

*Burton Landscape Group, Inc.*, 200 P.3d 254, 255 (Wash. Ct. App. 2009) ("Courts resolve the threshold legal question of arbitrability of the dispute by examining the arbitration agreement without inquiry into the merits of the dispute.").   Because questions of arbitrability are different than questions about the merits of a dispute, Verizon is mistaken in its argument that only a Merits Arbitrator can rule on arbitrability.   Indeed, the role of a Merits Arbitrator is "to determine the merits" of the dispute.  Supplementary Rules MC-7.

With the exception of *Ciccio v. SmileDirectClub*, LLC, 2 F.4th 577 (6th Cir. 2021), discussed below, all of the opinions of which I am aware do not prohibit the Association (and by extension a Process Arbitrator) from making "administrative" decisions that cause the Association to decline administration of an arbitration. For example, in *Hernandez v. MicroBilt Corp.*, 2022 WL 16569272, at *7 (D.N.J. Oct. 25, 2022), citing the Consumer Rules and the Protocol, the court refused to compel arbitration of the class action claims.  The court rejected the defendant's objection to the Association's decision holding the "Defendant . . . agreed to be bound by the processes as set forth under the AAA's rules."

Other courts have reached a similar conclusion. *E.g., Forby v. One Techs., LP*, 2022 WL 2871815, at *11 (N.D.Tex. July 21, 2022) ("[B]ecause the AAA declined to arbitrate her claim, Ms. Forby may now choose to submit her claim before the court. . . . [T]his matter has reached the court under terms to which Defendants agreed to be bound and they cannot . . . complain about enforcement

7

of the terms . . . ”);  *Bedgood v. Wyndham Vacation Resorts, Inc.*, 595 F. Supp. 3d 1195, 1202 (M.D.Fl. 2022) (motion to compel arbitration denied where “requesting the Court to compel arbitration would, in effect, bully the AAA to arbitrate an agreement that violates its own Consumer Due Process Rules”); *Eliasieh v. Legally Mine, LLC,* 2020 WL 1929244, at *4 (N.D.Cal. Apr. 21, 2020) (arbitration proceedings were terminated where the defendant did not follow the Association’s rules--“procedures laid out by the organization that it itself chose to administer arbitration arising under its arbitration clause”).[6]

Verizon takes issue with the foregoing line of cases, relying on *Ciccio v. SmileDirectClub*.  There are several important distinctions between that case and this proceeding.  First, the Consumer Rules specifically require that administration will only proceed if the Association determines an arbitration agreement complies with the Protocol.    In *Ciccio*, because the Association’s Healthcare Policy Statement was not part of the Association’s arbitration rules, the court observed that an Association employee’s decision to make it applicable to the dispute represented only a “policy choice for the parties,” *id.* at 586, regarding which the court found impermissible.  The court did characterize the Association’s actions as making an arbitrability determination which the court found, pursuant to the parties’ agreement, could only be made by an arbitrator.  To the extent the court was correct in describing the issue as one of arbitrability, an issue the court held

---

[6] The foregoing cases answer a point made on page 12 of Verizon’s submission.  Because the Mass Arbitration Provision provides disputes will be resolved by the Association, these cases explain administration by the Association includes adherence to the Consumer Rules which include complying with the Protocol as well.

must be decided by an arbitrator, by referring its administrative decision in this case to a Process Arbitrator, the Association has vested the decision, assuming it is a question of arbitrability, with a Process Arbitrator.

For the foregoing reasons I conclude that as the Process Arbitrator, appointed by the Association in accordance with the rules incorporated in the Mass Arbitration Provision,[7] I have the power to determine whether it substantially and materially complies with the Protocol.

<u>The Mass Arbitration Provision Does Not Substantially and Materially Comply with the Due Process Protocol</u>

Claimants contend the Mass Arbitration Provision does not materially and substantially comply with three Principles of the Protocol. Because I agree the Mass Arbitration Provision does not comply with Principle 8 regarding reasonable time limits, it is not necessary to consider the objections Claimants have made to the other principles. Principle 8 states that "ADR proceedings should occur within a reasonable time, without undue delay." The Commentary to Principle 8 emphasizes that a "basic requirement is that rules governing ADR establish and further the basic principle of conflict resolution within a reasonable time." The Commentary further notes that when a "Consumer dispute involves a small

---

[7] The Mass Arbitration Provision provides for arbitration under the rules of the Association or the Better Business Bureau. The parties have agreed to arbitrate under the rules of the Association. Consumer Rule R-1 states that when "parties have provided for the AAA's rules . . .as part of their consumer agreement, they shall be deemed to have agreed . . . the application of the AAA's rules . . . shall be an essential term of their . . . agreement." See *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1291 (11th Cir. 2022) (Arbitrations that proceed under the Consumer Arbitration Rules are administered by the AAA . . . .").

amount of money and relatively straightforward issues, it is reasonable to assume that an out-of-court resolution . . . should be relatively quick."[8]

The importance of timely resolution of consumer disputes has been the subject of much scholarship. As one noted author wrote:

> Unreasonable time delays can jeopardize the fairness of arbitration. Therefore, fairness may require that measures be put in place to ensure that arbitration is being carried out in an expeditious manner. Time limits or guidelines established by the arbitration provider may help avoid unnecessary delays at each step of the arbitration process. They may also help protect against abuse of the system, wherein a party with greater money and resources might attempt to wear down the other with costly delay.

Thomas J. Stipanowich, *The Arbitration Fairness Index: Using a Public Rating System to Skirt the Legal Logjam and Promote Fairer and More Effective Arbitration of Employment and Consumer Disputes*, 60 U. KAN. L. REV. 985, 1053 (2012); *e.g.*, Carrie Menkel-Meadow, *Ethics Issues in Arbitration and Related Dispute Resolution Processes: What's Happening and What's Not: Appendix A CPR-Georgetown Commission on Ethics and Standards in ADR*, 56 U. MIAMI L. REV. 949, 993-94 (2002) ("[K]ey indicia of fair and impartial processes . . . include . . . reasonable time limits.").

The Association correctly noted the Mass Arbitration Provision requires that only ten arbitrations may proceed until all demands for arbitration are

---

[8] Ensuring that disputes are resolved timely is a part of the ethical obligation of arbitrators. *See* CODE OF ETHICS FOR ARBITRATORS IN COMMERCIAL DISPUTES Canon 1(F) ("An arbitrator should conduct the arbitration process so as to advance the . . . efficient resolution of the matters submitted for decision.").

10

resolved.[9]  Is it possible that after the first ten bellwether arbitrations the parties

could negotiate or mediate a resolution to all the remaining claims?  Of course.  To

its credit, Verizon has proposed a number of measures that possibly could expedite

the resolution of claims, including its commitment to mediate the remaining

claims after completion of the bellwether arbitrations.[10]  But relying on the good

faith of the parties to expedite resolution of large numbers of individual consumer

claims, does not make timely resolution of those claims a requirement.  Even

taking at face value each party's good faith and intent to find a timely resolution of

many thousands of claims, Verizon has presented no principle of law that would

allow a court, or arbitrator, to ignore the clear contract language in deference to

promises of cooperation.

Although no court has answered the precise question of whether the Mass

Arbitration Provision complies with the Protocol, one court has reviewed the Mass

Arbitration Agreement under California contract law.[11]  In *MacClelland v. Cellco

P'ship*, 2022 WL 2390997 (N.D.Cal. July 1, 2022), the court, after finding that the

---

[9] Each party is to select five claims to be heard by different arbitrators.  The ten hearings are to be conducted individually and not consolidated; nothing restricts each party's ability to choose which consumer claims are to be included in the initial bellwether proceeding.

[10] Verizon points to *McGrath v. DoorDash, Inc*, 2020 WL 6526129, at *10 (N.D.Cal. Nov. 5, 2020), as an example of a court which has approved the use of a bellwether process. The court recognized, however, a significant difference not available to consumers of Verizon here--"Most important, after the mediation process, a claimant can choose to opt out of the arbitration process and go back to court . . . ."

[11] Verizon is correct that one other court has reached a different conclusion, rejecting a claim that Verizon's Mass Arbitration Provision was unconscionable.  However, the cryptic ruling of the Middlesex County New Jersey Superior Court makes it difficult to evaluate the court's reasoning.  *Achey v. Cellco P'ship*, No. MID-L-0-160-22 (N.J. Super. Ct. Law Div. July 15, 2022).

1   Mass Arbitration Provision was a contract of adhesion, went on to consider

2   whether it was substantively unconscionable.[12]   Substantive unconscionability

3   under California law examines the fairness of an adhesion contract's terms. *OTO,*

4   *L.L.C. v. Kho*, 447 P.3d 680, 692 (Cal. 2019).   The *MacClelland* court found the

5   Mass Arbitration Provision substantively unconscionable in a number of respects,

6   and, apropos to this case, specifically with regard to the prospect of delay in

7   resolving the several thousand claims brought in that case.   Commenting on the

8   requirement that only ten cases may be heard at one time, the court observed that

9   "[d]elaying the ability of one to vindicate a legal claim by years . . . 'conflict[s]

10  with one of the basic principles of our legal system—justice delayed is justice

11  denied.'" 2022 WL 2390997 at *12 (citation omitted).

12

13          Although the court did not address the Consumer Rules, it did discuss the

14  Mass Arbitration Provision's relationship to the Supplementary Rules.   The court

15  held the Mass Arbitration Provision "stands in stark contrast" to the

16  Supplementary Rules which were developed by the Association to "provide parties

17  . . . with an efficient and economical path toward the resolution of multiple

18  individual disputes." *Id.* at *14.   In describing the salutary purpose of the

19  Supplementary Rules, the court held:

20

21

22

23

---

24  [12] I understand the definition of substantive unconscionability is not the same in every
    state.   Whether the *MacClelland* case is the final word on the issue of unconscionability
25  remains to be seen.   However, the court's comments regarding the anticipated delays in
    resolving individual claims supports my conclusion that the Mass Arbitration Provision
26  does not meet the test of reasonableness as required by the Protocol.

> The Supplementary Rules do not require that a party wait a set amount of time before initiating a demand for arbitration. Nor do they require that arbitrations proceed in tranches.

*Id.* Although the question of unconscionability is not before me,[13] the court's focus on the delay associated with conducting arbitrations under the Mass Arbitration Provision confirms my opinion that it does not "materially and substantially" comply with Principle 8 of the Protocol. Stated simply, the prospect of many years delay in the resolution of thousands of consumer disputes with Verizon does not meet the test of reasonableness as required by the Protocol. That is so because: (1) a core purpose of the Protocol is to promote the timely resolution of consumer disputes; and (2) as confirmed by the *MacClelland* court,[14] the Mass Arbitration Agreement by its unambiguous language would result in extraordinary delays in the resolution of mass claims brought against Verizon.

### Conclusion

Verizon points out it submitted the Mass Arbitration Provision to the Association relying on the Association's approval before including it in contracts with consumers. If a determination is made the Mass Arbitration Provision does not comply with the Protocol, Verizon claims it will have been misled by its reliance on the initial determinations made by the Association. There are several reasons why that isn't the case. First, in the Association's communications with

---

[13] Although Claimants' objections to the Mass Arbitration Provision certainly sound as if Claimants are complaining it is unconscionable, the only determination made in this Order is that the Mass Arbitration Provision does not comply with Principle 8 of the Protocol. No determination is being made whether the Provision is unconscionable.

[14] The court's analysis of how the Mass Arbitration Provision would be implemented is completely separate from its legal characterization of the Provision as unconscionable.

13

Verizon it repeatedly pointed out its administrative determination "cannot be relied upon or construed as a legal opinion or advice regarding the enforceability of the arbitration clause."[15]   Second, by providing in the Mass Arbitration Provision for administration by the Association, Verizon agreed to arbitrate under the rules of the Association which include the Consumer Rules, R-1, and the Supplementary Rules, MC-1.   These rules specifically authorize a Process Arbitrator to redetermine any administrative decision made by the Association.

Thus, Verizon should reasonably have expected that the Association's administrative decision regarding whether the Mass Arbitration Provision complies with the Protocol was subject to review in accordance with the Supplementary Rules. However, if my ruling results in the Association declining to administer arbitrations under the Mass Arbitration Provision, disputes that would fall under its terms may wind up in court, and not in arbitration. Whether Verizon's expectations were reasonable or not, that is undoubtedly not what Verizon intended.

Is there a practical solution at this point?  I think so.  It is not uncommon in a contract of adhesion for the stronger party to reserve the right to modify the contract, and the arbitration provisions in particular.  Indeed, that is what Verizon

---

[15] Moreover, in its December 8, 2021, letter to Verizon, the Association wrote:
> This letter is not a contract, promise and/or agreement to provide any services pursuant to the Verizon consumer arbitration clause and should not be construed as an opinion or assurance of the legal enforceability of the arbitration agreements.  The AAA further reserves the right to decline administration of cases under the Verizon arbitration agreement in the future due to changes in the state of existing law and/or changes in AAA policies, rules and procedures.

14

has done.  Verizon reserves the right to change the Wireless Customer Agreement, and specifically with respect to the arbitration agreement, it may change those terms except for the resolution of disputes that arose before the change.[16] Presumably, Verizon could amend the Mass Arbitration Provision for existing customers to remove the objection to Principle 8 of the Protocol.  This would enable the Association, consistent with its practice, to administer arbitrations with Verizon.  *See generally* Christopher R. Drahozal & Samantha Zyontz, *Private Regulation of Consumer Arbitration*, 79 TENN. L. REV. 289, 309-10, 332 (2012).

In summary, I have concluded that under the Supplementary Rules I have the authority to determine whether the Mass Arbitration Agreement complies with the Protocol.  I also have concluded it does not comply with Principle 8.  Nothing about this ruling is intended, however, to deprive the Association of its customary practice of asking a registrant to either waive the offending provision or revise it to bring the clause into compliance with the Protocol.

DATED this 22nd day of February, 2023.

_____
Bruce E. Meyerson, Process Arbitrator

---

[16] I express no opinion whether such a solution would apply to the present dispute.

any information (like pictures) that gets lost or deleted if we work on your device. If another wireless carrier is involved in any problem (for example, while you're roaming), you also agree to any limitations of liability that it imposes.

**HOW DO I RESOLVE DISPUTES WITH VERIZON?**
WE HOPE TO MAKE YOU A HAPPY CUSTOMER, BUT IF THERE'S AN ISSUE THAT NEEDS TO BE RESOLVED, THIS SECTION OUTLINES WHAT'S EXPECTED OF BOTH OF US.

YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT, AS DISCUSSED BELOW. YOU UNDERSTAND THAT BY THIS AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY. WHILE THE PROCEDURES IN ARBITRATION MAY BE DIFFERENT, AN ARBITRATOR CAN AWARD YOU THE SAME DAMAGES AND RELIEF, AND MUST HONOR THE SAME TERMS IN THIS AGREEMENT, AS A COURT WOULD. IF THE LAW ALLOWS FOR AN AWARD OF ATTORNEYS' FEES, AN ARBITRATOR CAN AWARD THEM TOO. THE SAME DEFENSES ARE ALSO AVAILABLE TO BOTH PARTIES AS WOULD BE AVAILABLE IN COURT, INCLUDING ANY APPLICABLE STATUTE OF LIMITATIONS. WE ALSO BOTH AGREE THAT:

(1) THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. EXCEPT FOR SMALL CLAIMS COURT CASES, ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT, OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US, OR FROM ANY ADVERTISING FOR ANY SUCH PRODUCTS OR SERVICES, OR FROM OUR EFFORTS TO COLLECT AMOUNTS YOU MAY OWE US FOR SUCH PRODUCTS OR SERVICES, INCLUDING ANY DISPUTES YOU HAVE WITH OUR EMPLOYEES OR AGENTS, WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB"). YOU CAN ALSO BRING ANY ISSUES YOU MAY HAVE TO THE ATTENTION OF FEDERAL, STATE OR LOCAL GOVERNMENT AGENCIES, AND IF THE LAW ALLOWS, THEY CAN SEEK RELIEF AGAINST US FOR YOU. THIS AGREEMENT TO ARBITRATE CONTINUES TO APPLY EVEN AFTER YOU HAVE STOPPED RECEIVING SERVICE FROM US.

(2) UNLESS YOU AND VERIZON AGREE OTHERWISE, THE ARBITRATION WILL TAKE PLACE IN THE COUNTY OF YOUR BILLING ADDRESS. FOR CLAIMS OVER $10,000, THE AAA'S CONSUMER ARBITRATION RULES WILL APPLY. FOR CLAIMS OF $10,000 OR LESS, THE PARTY BRINGING THE CLAIM CAN CHOOSE EITHER THE AAA'S CONSUMER ARBITRATION RULES OR THE BBB'S RULES FOR BINDING ARBITRATION. YOU CAN GET PROCEDURES, RULES AND FEE INFORMATION FROM THE AAA (WWW.ADR.ORG), THE BBB (WWW.BBB.ORG) OR FROM US. FOR CLAIMS OF $10,000 OR LESS, YOU CAN CHOOSE WHETHER YOU'D LIKE THE ARBITRATION CARRIED OUT BASED ONLY ON DOCUMENTS SUBMITTED TO THE ARBITRATOR, OR BY A HEARING IN PERSON OR BY PHONE. ALTERNATIVELY, FOR CLAIMS WITHIN THE JURISDICTIONAL LIMIT OF THE SMALL CLAIMS COURT IN THE STATE ENCOMPASSING YOUR BILLING ADDRESS, EITHER YOU OR VERIZON CAN CHOOSE TO BRING AN INDIVIDUAL ACTION IN SMALL CLAIMS COURT INSTEAD OF PROCEEDING IN ARBITRATION; FURTHERMORE, IF THE CLAIMS IN ANY REQUEST OR DEMAND FOR ARBITRATION COULD HAVE BEEN BROUGHT IN SMALL CLAIMS COURT, THEN EITHER YOU OR VERIZON MAY CHOOSE TO HAVE THE CLAIMS HEARD IN SMALL CLAIMS COURT, RATHER THAN IN ARBITRATION, AT ANY TIME BEFORE THE ARBITRATOR IS APPOINTED, BY NOTIFYING THE OTHER PARTY OF THAT CHOICE IN WRITING. IF THIS PROVISION OR THE LIMITATION ON BRINGING ACTIONS TO SMALL CLAIMS COURT IS FOUND TO BE INVALID, THEN THIS PROVISION SHALL BE SEVERABLE AND THE MATTER WILL PROCEED IN ARBITRATION; IN NO WAY WILL THIS PROVISION ALLOW FOR AN ACTION TO BE BROUGHT ON A CLASS OR COLLECTIVE BASIS.

(3) THIS AGREEMENT DOESN'T ALLOW CLASS OR COLLECTIVE ARBITRATIONS EVEN IF THE AAA OR BBB PROCEDURES OR RULES WOULD. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE ARBITRATOR MAY AWARD MONEY OR INJUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM. NO CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL OR GENERAL INJUNCTIVE RELIEF THEORIES OF LIABILITY OR PRAYERS FOR RELIEF MAY BE MAINTAINED IN ANY ARBITRATION HELD UNDER THIS AGREEMENT. ANY QUESTION REGARDING THE ENFORCEABILITY OR INTERPRETATION OF THIS PARAGRAPH SHALL BE DECIDED BY A COURT AND NOT THE ARBITRATOR.

(4) IF EITHER OF US INTENDS TO SEEK ARBITRATION UNDER THIS AGREEMENT, THE PARTY SEEKING ARBITRATION MUST FIRST NOTIFY THE OTHER PARTY OF THE DISPUTE IN WRITING AT LEAST 60 DAYS IN ADVANCE OF INITIATING THE ARBITRATION. NOTICE TO VERIZON SHOULD BE SENT TO VERIZON WIRELESS DISPUTE RESOLUTION MANAGER, ONE VERIZON WAY, BASKING RIDGE, NJ 07920. THE NOTICE MUST INCLUDE ENOUGH INFORMATION TO ALLOW US TO IDENTIFY YOUR ACCOUNT AS WELL AS TO ASSESS AND ATTEMPT TO RESOLVE YOUR CLAIM, INCLUDING THE NAME OF THE VERIZON WIRELESS ACCOUNT HOLDER, THE MOBILE TELEPHONE NUMBER AT ISSUE, A DESCRIPTION OF THE CLAIM, THE SPECIFIC FACTS SUPPORTING THE CLAIM, THE DAMAGES YOU CLAIM TO HAVE SUFFERED AND THE RELIEF YOU ARE SEEKING. THE NOTICE REQUIREMENT IS DESIGNED TO ALLOW VERIZON TO MAKE A FAIR, FACT-BASED OFFER OF SETTLEMENT IF IT CHOOSES TO DO SO. YOU CANNOT PROCEED TO ARBITRATION UNLESS YOU PROVIDE THIS INFORMATION. YOU MAY CHOOSE TO BE REPRESENTED BY AN ATTORNEY OR OTHER PERSON AS PART OF THIS PROCESS, BUT IF YOU DO YOU MUST SUBMIT A LETTER OR THE FORM AVAILABLE AT THIS LINK AUTHORIZING US TO DISCUSS YOUR ACCOUNT INFORMATION WITH THIS ATTORNEY OR OTHER PERSON. THE SUFFICIENCY OF THIS NOTICE IS AN ISSUE TO BE DECIDED BY A COURT PRIOR TO THE FILING OF ANY DEMAND FOR ARBITRATION. IF YOU HAVE PROVIDED THIS INFORMATION AND WE ARE UNABLE TO RESOLVE OUR DISPUTE WITHIN 60 DAYS, EITHER PARTY MAY THEN PROCEED TO FILE A CLAIM FOR ARBITRATION. WE'LL REIMBURSE ANY FILING FEE THAT THE AAA OR BBB CHARGES YOU FOR ARBITRATION OF THE DISPUTE AT THE CONCLUSION OF THE ARBITRATION IF YOU FULLY PARTICIPATE IN THE PROCEEDING. WE'LL ALSO PAY ANY ADMINISTRATIVE AND ARBITRATOR FEES CHARGED BY THE ARBITRATION TRIBUNAL. IF THE ARBITRATOR DETERMINES THAT YOUR CLAIM WAS FILED FOR PURPOSES OF HARASSMENT OR IS PATENTLY FRIVOLOUS, THE ARBITRATOR WILL REQUIRE YOU TO REIMBURSE VERIZON FOR ANY FILING, ADMINISTRATIVE OR ARBITRATOR FEES ASSOCIATED WITH THE ARBITRATION.

(5) WE MAY, BUT ARE NOT OBLIGATED TO, MAKE A WRITTEN SETTLEMENT OFFER ANYTIME BEFORE THE ARBITRATION HEARING. THE AMOUNT OR TERMS OF ANY SETTLEMENT OFFER MAY NOT BE DISCLOSED TO THE ARBITRATOR UNTIL AFTER THE ARBITRATOR ISSUES AN AWARD ON THE CLAIM. IF YOU DON'T ACCEPT THE OFFER AND THE ARBITRATOR AWARDS YOU AN AMOUNT OF MONEY THAT'S MORE THAN OUR OFFER BUT LESS THAN $5,000, OR IF WE DON'T MAKE YOU AN OFFER, AND THE ARBITRATOR AWARDS YOU ANY AMOUNT OF MONEY BUT LESS THAN $5,000, THEN WE AGREE TO PAY YOU $5,000 INSTEAD OF THE AMOUNT AWARDED. IN THAT CASE WE ALSO AGREE TO PAY ANY REASONABLE ATTORNEYS' FEES AND EXPENSES, REGARDLESS OF WHETHER THE LAW REQUIRES IT FOR YOUR CASE. IF THE ARBITRATOR AWARDS YOU MORE THAN $5,000, THEN WE WILL PAY YOU ONLY THAT AMOUNT.

(6) IF 25 OR MORE CUSTOMERS INITIATE NOTICES OF DISPUTE WITH VERIZON WIRELESS RAISING SIMILAR CLAIMS, AND COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS BRINGING THE CLAIMS ARE THE SAME OR COORDINATED FOR THESE CUSTOMERS, THE CLAIMS SHALL PROCEED IN ARBITRATION IN A COORDINATED PROCEEDING. COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS AND COUNSEL FOR VERIZON WIRELESS SHALL EACH SELECT FIVE CASES TO PROCEED FIRST IN ARBITRATION IN A BELLWETHER PROCEEDING. THE REMAINING CASES SHALL NOT BE FILED IN ARBITRATION UNTIL THE FIRST TEN HAVE BEEN RESOLVED. IF THE PARTIES ARE UNABLE TO RESOLVE THE REMAINING CASES AFTER THE CONCLUSION OF THE BELLWETHER PROCEEDING, EACH SIDE MAY SELECT ANOTHER FIVE CASES TO PROCEED TO ARBITRATION FOR A SECOND BELLWETHER PROCEEDING. THIS PROCESS MAY CONTINUE UNTIL THE PARTIES ARE ABLE TO RESOLVE ALL OF THE CLAIMS, EITHER THROUGH SETTLEMENT OR ARBITRATION. A COURT WILL HAVE AUTHORITY TO ENFORCE THIS CLAUSE AND, IF NECESSARY, TO ENJOIN THE MASS FILING OF ARBITRATION DEMANDS AGAINST VERIZON.

(7) AN ARBITRATION AWARD AND ANY JUDGMENT CONFIRMING IT APPLY ONLY TO THAT SPECIFIC CASE; IT CAN'T BE USED IN ANY OTHER CASE EXCEPT TO ENFORCE THE AWARD ITSELF.

**(8) IF FOR SOME REASON THE PROHIBITION ON CLASS ARBITRATIONS SET FORTH IN SUBSECTION (3) CANNOT BE ENFORCED AS TO ALL OR PART OF A DISPUTE, THEN THE AGREEMENT TO ARBITRATE WILL NOT APPLY TO THAT DISPUTE OR PART OF THE DISPUTE.**

CA-P.7

(9) **IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN THROUGH ARBITRATION, YOU AND VERIZON AGREE THAT THERE WILL NOT BE A JURY TRIAL. YOU AND VERIZON UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY WAY. IN THE EVENT OF LITIGATION, THIS PARAGRAPH MAY BE FILED TO SHOW A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**About this Agreement**

If either you or we don't enforce our rights under this agreement in one instance, that doesn't mean you or we won't or can't enforce those rights in any other instance. You cannot assign this Agreement or any of your rights or duties under it without our permission. However, we may assign this Agreement or any debt you owe us without notifying you. If you're a Postpay customer, please note that many notices we send to you will show up as messages on your monthly bill. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. If we send other notices to you, they will be considered received immediately if we send them to your wireless device, or to any email or fax number you've given us, or after three days if we mail them to your billing address. If you need to send notices to us, please send them to the customer service address on your latest bill.

If you're a Prepaid customer and we send notices to you, they will be considered received immediately if we send them to your wireless device or to any email you've given us, or if we post them as a precall notification on your Service, or after three days if we mail them to the most current address we have for you. If you need to send notices to us, please send them to the Customer Service Prepaid address at verizon.com/contactus.

If any part of this agreement, including anything regarding the arbitration process (except for the prohibition on class arbitrations as explained in part 8 of the dispute resolution section above), is ruled invalid, that part may be removed from this agreement.

This agreement and the documents it incorporates form the entire agreement between us. You can't rely on any other documents, or on what's said by any Sales or Customer Service Representatives, and you have no other rights regarding Service or this agreement. This Agreement isn't for the benefit of any third party except our parent companies, affiliates, subsidiaries, agents, and predecessors and successors in interest. Except where we've agreed otherwise elsewhere in this agreement, this agreement and any disputes covered by it are governed by federal law and the laws of the state encompassing the area code of your wireless phone number when you accepted this agreement, without regard to the conflicts of laws and rules of that state.

Updated October 20, 2021

CA-P.8